## No. 21-12493

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CHERRI WALKER,
*Plaintiff–Appellant,*

v.

LIFE INSURANCE COMPANY OF NORTH AMERICA,
*Defendant–Appellee.*

On Appeal from the United States District Court for
the Northern District of Alabama, No. 5:16-cv-506-HNJ

# BRIEF FOR APPELLEE
LIFE INSURANCE COMPANY
OF NORTH AMERICA

Michael D. Mulvaney
John A. Little, Jr.
MAYNARD COOPER & GALE P.C.
1901 Sixth Ave. N., Suite 1700
Birmingham, Alabama 35203
(205) 254-1000
mmulvaney@maynardcooper.com
jlittle@maynardcooper.com

*Counsel for Life Insurance
Company of North America*

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The following is an **amended** list of all known judges, attorneys, persons, associations of persons, firms, partnerships, corporations, and other legal entities that have an interest in the outcome of this case, including subsidiaries, conglomerates, affiliates and parent corporations, any publicly held company that owns 10 percent or more of a party's stock, and other identifiable legal entities related to a party. Information not included on a previous Certificate of Interested Persons is underlined.

1. Calhoun, David A. (former counsel for Defendant)

2. Davis, Hon. Harwell G., III (former United States Magistrate Judge for the Northern District of Alabama)

3. Grabhorn Law Office, PLLC (counsel for Plaintiff)

4. Grabhorn, Andrew M. (counsel for Plaintiff)

5. Grabhorn, Michael D. (counsel for Plaintiff)

6. Jones, Walter M. (former counsel for Defendant)

7. Johnson, Hon. Herman N., Jr. (United States Magistrate Judge for the Northern District of Alabama)

8. King, Hon. Lanny (United States Magistrate Judge for the

Western District of Kentucky)

9.    Life Insurance Company of North America <u>(Defendant)</u>

10.    Little, John <u>A., Jr. (counsel for Defendant)</u>

11.    Maynard, Cooper & Gale, P.C. <u>(counsel for Defendant)</u>

12.    <u>Murphy, Grace R. (former counsel for Defendant)</u>

13.    Mulvaney, Michael <u>D. (counsel for Defendant)</u>

14.    New York Life Insurance Company <u>(parent of Defendant)</u>

15.    Reynolds, Bruce

16.    <u>Riopka, Ashlee D. (former counsel for Defendant)</u>

17.    <u>Russell, Hon. Thomas B. (United States District Judge for the Western District of Kentucky)</u>

18.    Siniard, Timberlake, & League, P.C. <u>(counsel for Plaintiff)</u>

19.    Timberlake, Michael <u>K. (counsel for Plaintiff)</u>

20.    <u>Veeneman, Sara (former counsel for Defendant)</u>

21.    <u>Wahlheim, William B., Jr. (former counsel for Defendant)</u>

22.    Walker, Breanna

23.    Walker, Cherri <u>(Plaintiff)</u>

24.    <u>Wyatt Tarrant & Combs LLP (former counsel for Defendant)</u>

25.    <u>Wyrick, Mitzi D. (former counsel for Defendant)</u>

Appellee Life Insurance Company of North America ("LINA") certifies that it is a wholly owned subsidiary of New York Life Insurance Company. New York Life Insurance Company is not a subsidiary of any other entity. No publicly held corporation owns 10% or more of the stock of LINA or New York Life Insurance Company. LINA and New York Life Insurance Company are not publicly traded.

# STATEMENT REGARDING ORAL ARGUMENT

This Court should not need oral argument to affirm, because the straightforward application of settled law resolves each issue on appeal. Because Appellee Life Insurance Company of North America ("LINA") relied on expert opinions that created a legitimate and arguable reason for its claim decisions, well-established Alabama law forecloses Plaintiff Cherri Walker's claim for insurance bad faith, and the District Court rightly granted summary judgment for LINA on that claim. Because Alabama Supreme Court precedent holds that mental-anguish damages are not recoverable for a breach of the type of insurance policy at issue here, the District Court properly excluded evidence of Ms. Walker's alleged mental anguish. And because existing law dictates that prejudgment interest is calculated as simple interest, while postjudgment interest is calculated at the federal rate, the District Court's prejudgment and postjudgment interest decisions were correct. Oral argument, therefore, would not aid this Court in the disposition of this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT.................................................................................... C-1

STATEMENT REGARDING ORAL ARGUMENT....................................................i

TABLE OF CONTENTS....................................................................................ii

TABLE OF AUTHORITIES..............................................................................v

STATEMENT OF JURISDICTION ...................................................................xii

STATEMENT OF THE ISSUES ........................................................................1

STATEMENT OF THE CASE............................................................................2

I.      Nature of the Case.......................................................................2

II.     Statement of the Facts ...............................................................3

        A.      The insurance policies. .....................................................3

        B.      Ms. Walker's claims and appeals. ....................................6

                1.      The long-term disability claim. .................................6

                2.      The waiver-of-premium claim. .................................9

III.    Procedural History.......................................................................11

        A.      The lawsuit and relevant pretrial history. .....................11

        B.      The trial and the post-trial interest jockeying.................13

IV.     Standards of Review .....................................................................14

SUMMARY OF THE ARGUMENT .................................................................16

ARGUMENT..................................................................................................19

I.      The District Court did not err in preventing Ms. Walker
        from seeking mental-anguish damages, because Alabama
        law does not permit those damages for breach of a
        disability insurance policy.........................................................19

        A.      Mental-anguish damages for breach of contract are
                generally not available under Alabama law. ...................20

B. The Alabama Supreme Court held in *Sanford v. Western Life Insurance Co.* that disability insurance does not present an exception to the rule against mental-anguish damages. ................................................ 21

C. Ms. Walker relies on an inapplicable case about a dissimilar class of insurance contracts. ........................... 25

D. The Court should not certify any question to the Alabama Supreme Court. ................................................ 29

II. The District Court did not err in granting LINA's motion for summary judgment on bad faith. ......................................... 31

A. Under Alabama law, all bad-faith plaintiffs must establish the absence of a legitimate, arguable reason for an insurer's decision. .................................................... 31

B. The District Court correctly granted LINA summary judgment on bad faith based on Ms. Walker's failure to establish the absence of a legitimate, arguable reason for denying her claim. ........................................... 35

C. Ms. Walker's criticisms of LINA's investigation are irrelevant given her failure to establish the absence of a debatable reason, and inaccurate in any event. ....... 41

III. The District Court correctly provided postjudgment interest at the federal statutory rate and prejudgment interest at 1.5% per month simple interest under the contract. ..................................................................................... 46

A. The District Court correctly provided for postjudgment interest at the federal statutory rate. ........ 46

1. Federal law—not Alabama law—governs postjudgment interest on a federal judgment. ........ 47

2. The policy does not reflect an intent to contract around the federal postjudgment-interest statute. .................................................................. 49

      3.    Ms. Walker is not entitled to postjudgment interest at the contractual rate because she did not sue for postjudgment interest under the contract. .................................................................. 50

  B.   The District Court correctly used a simple-interest calculation to determine prejudgment interest. ............. 52

      1.    The LTD Policy—interpreted according to Alabama law—provides for simple interest ........... 52

      2.    The District Court properly disregarded or declined to consider Walker's unpersuasive, extracontractual evidence in support of compound interest. ................................................. 56

CONCLUSION ........................................................................................... 61

CERTIFICATE OF COMPLIANCE .................................................................... 62

# TABLE OF AUTHORITIES

## CASES

*Access Now, Inc. v. Southwest Airlines Co.*,
    385 F.3d 1324 (11th Cir. 2004) ...................................................... 46

*Alfa Mutual Fire Insurance Co. v. Thomas*,
    738 So. 2d 815 (Ala. 1999) .............................................................. 34

*Anderson v. Unum Life Insurance Co. of America*,
    414 F. Supp. 2d 1079 (M.D. Ala. 2006) .......................................... 48

*Bailey v. National Union Fire Insurance Co. of Pittsburgh*,
    No. 12-cv-4206, 2015 WL 1883725 (N.D. Ala. Apr. 24, 2015) ....... 38

*Beaulieu Group v. Inman*,
    No. 10-cv-1590, 2011 WL 4971701 (D. Ariz. Oct. 19, 2011) .......... 50

*Belcher Pharmaceuticals, LLC v. Hospira, Inc.*,
    1 F.4th 1374 (11th Cir. 2021) ........................................................ 51

*Benson v. Tocco, Inc.*,
    113 F.3d 1203 (11th Cir. 1997) ...................................................... 15

*Bowers v. Wal-Mart Stores, Inc.*,
    827 So. 2d 63 (Ala. 2001) .................................................. 20, 21, 23

*BP Products North America, Inc. v. Youssef*,
    296 F. Supp. 2d 1351 (M.D. Fla. 2004) .......................................... 51

*Burgess v. Williamson*,
    506 F.2d 870 (5th Cir. 1975) .......................................................... 54

*Burlington Northern Railroad Co. v. Whitt*,
    611 So. 2d 219 (Ala. 1992) ........................................................ 53, 54

*Caradigm USA LLC v. PruittHealth, Inc.*,
    964 F.3d 1259 (11th Cir. 2020) .......................................... 54, 55, 56

*Chapman v. American Cyanamid Co.*,
  861 F.2d 1515 (11th Cir. 1988) ...................................................... 29

*Chavers v. National Security Fire & Casualty Co.*,
  405 So. 2d 1 (Ala. 1981) .................................................................. 32

*Cole v. Owners Insurance Co.*,
  326 F. Supp. 3d 1307 (N.D. Ala. 2018) .......................................... 32

*Crook v. Allstate Indemnity Co.*,
  314 So. 3d 1188 (Ala. 2020) ............................................................ 41

*Dependahl v. Falstaff Brewing Corp.*,
  653 F.2d 1208 (8th Cir. 1981) ........................................................ 58

*Duquette v. National Life Insurance Co.*,
  No. 15-cv-316, 2017 WL 5957809
  (N.D. Ala. Feb. 14, 2017) ................................................... 23, 27, 38

*Engelhardt v. Paul Revere Life Insurance Co.*,
  77 F. Supp. 2d 1226 (M.D. Ala. 1999) ........................................... 48

*Fairbaugh v. Life Insurance Co. of North America*,
  872 F. Supp. 2d 174 (D. Conn. 2012) ............................................. 59

*FCS Advisors, Inc. v. Fair Finance Co.*,
  605 F.3d 144 (2d Cir. 2010) ...................................................... 49, 50

*Florence Nightingale Nursing Service, Inc. v. Blue Cross/Blue
   Shield of Alabama*,
  41 F.3d 1476 (11th Cir. 1995) ........................................................ 48

*G.M. Brod & Co. v. U.S. Home Corp.*,
  759 F.2d 1526 (11th Cir. 1985) ...................................................... 48

*Hackney v. Lincoln National Fire Insurance Co.*,
  657 F. App'x 563 (6th Cir. 2016) .................................................... 45

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability
   Litigation*,
  517 F. Supp. 2d 662 (S.D.N.Y. 2007) ............................................. 20

*In re Riebesell*,
  586 F.3d 782 (10th Cir. 2009) .......................................................49

*Independent Fire Insurance Co. v. Lunsford*,
  621 So. 2d 977 (Ala. 1993).............................................................26

*Insolia v. Philip Morris Inc.*,
  216 F.3d 596 (7th Cir. 2000) .........................................................29

*Insurance Co. of North America v. Lexow*,
  937 F.2d 569 (11th Cir. 1991) .......................................................48

*James River Insurance Co. v. Ultratec Special Effects Inc.*,
  22 F.4th 1246 (11th Cir. 2022)................................................22, 25

*Johnson v. Life Insurance Co. of North America*,
  No. 05-cv-357, 2008 WL 11451473 (D.N.M. June 30, 2008)..........56

*Jones v. Regions Bank*,
  25 So. 3d 427 (Ala. 2009)...............................................................47

*Lanford v. Life Insurance Co. of North America*,
  No. 15-cv-4029, 2017 BL 267779 (C.D. Cal. Aug. 1, 2017)............58

*Liberty Homes, Inc. v. Epperson*,
  581 So.2d 449 (Ala. 1991)...............................................................21

*Loberg v. Cigna Group Insurance*,
  No. 09-cv-280, 2012 WL 4089889 (D. Neb. Sept. 17, 2012)...........58

*Matamoros v. Broward Sheriff's Office*,
  2 F.4th 1329 (11th Cir. 2021).........................................................29

*Mercado v. City of Orlando*,
  407 F.3d 1152 (11th Cir. 2005) ......................................................14

*Michigan Millers Mutual Insurance Corp. v. Benfield*,
  140 F.3d 915 (11th Cir. 1998) ........................................................15

*National Security Fire & Casualty Co. v. Bowen*,
  417 So. 2d 179 (Ala. 1982)..............................................................33

vii

*Noons v. Holiday Hospitality Franchising, Inc.*,
705 S.E.2d 166 (Ga. Ct. App. 2010) ..............................................55

*Oliver v. MONY Life Insurance Co.*,
No. 15-cv-905, 2016 WL 7384842 (N.D. Ala. Dec. 21, 2016) .........23

*Pate v. Rollison Logging Equipment, Inc.*,
628 So. 2d 337 (Ala. 1993)............................................ 25, 26, 27, 28

*Pierce v. United States*,
255 U.S. 398 (1921) ........................................................................51

*Pisciotta v. Old National Bancorp*,
499 F.3d 629 (7th Cir. 2007) ..........................................................29

*Quinlan v. Koch Oil Co.*,
25 F.3d 936 (10th Cir. 1994) ..........................................................53

*Rhynes v. Branick Manufacturing Corp.*,
629 F.2d 409 (5th Cir. Unit A 1980) ..............................................29

*Rochow v. Life Insurance Co. of North America*,
851 F. Supp. 2d 1090 (E.D. Mich. 2012),
*vacated and remanded*,
780 F.3d 364 (6th Cir. 2015) (en banc) ..........................................58

*Ruiz de Molina v. Merritt & Furman Insurance Agency, Inc.*,
207 F.3d 1351 (11th Cir. 2000) .................................... 20, 21, 26, 28

*\*Sanford v. Western Life Insurance Co.*,
368 So. 2d 260 (Ala. 1979)...................................................... *passim*

*Sapuppo v. Allstate Floridian Insurance Co.*,
739 F.3d 678 (11th Cir. 2014) ........................................................60

*SEB S.A. v. Sunbeam Corp.*,
476 F.3d 1317 (11th Cir. 2007) ................................................ 14, 53

*Sessums v. Louisiana Power & Light Co.*,
652 F.2d 579 (5th Cir. Unit A Aug. 1981)......................................29

viii

*Shelter Mutual Insurance Co. v. Barton*,
    822 So. 2d 1149 (Ala. 2001).............................................................34

\**State Farm Fire & Casualty Co. v. Brechbill*,
    144 So. 3d 248 (Ala. 2013)...................................................... *passim*

*Taylor v. Baptist Medical Center*,
    400 So. 2d 369 (Ala. 1981).............................................................21

*Thai Meditation Association of Alabama, Inc. v. City of Mobile*,
    980 F.3d 821 (11th Cir. 2020) .......................................................30

*Thayer v. Randy Marion Chevrolet Buick Cadillac, LLC*,
    30 F.4th 1290 (11th Cir. 2022)......................................................14

*United States v. Campbell*,
    26 F.4th 860 (11th Cir. 2022) (en banc).........................................51

*Vincent v. Blue Cross-Blue Shield of Alabama, Inc.*,
    373 So. 2d 1054 (Ala. 1979)...........................................................20

*Volkswagen of America, Inc. v. Dillard*,
    579 So. 2d 1301 (Ala. 1991)...........................................................21

*Weaver v. Allstate Insurance Co.*,
    574 So. 2d 771 (Ala. 1990).......................................................34, 39

*Weisberg v. Guardian Life Insurance Co. of America*,
    No. 16-cv-568, 2017 WL 5140547 (N.D. Ala. Oct. 24, 2017)..........38

## STATUTES

28 U.S.C.

§ 1291..........................................................................................xii

§ 1332(a) .....................................................................................xii

§ 1961.............................................................................. 47, 49, 58

§ 1961(a) .....................................................................................48

29 U.S.C. § 1132(a)(3) .............................................................. 58

Alabama Code

§ 6-5-462 ........................................................................... 24

§ 8-8-10 ............................................................................ 47

§ 27-1-17(b) ...................................................................... 48

§ 27-1-17(c) ................................................................. 47, 48

Employee Retirement Income and Security Act of 1974,
29 U.S.C. § 1001 *et seq.* ................................................... 11

Kentucky Revised Statutes § 311.550(10) ............................... 45

## <span style="text-decoration: underline">RULES</span>

Alabama Rule of Appellate Procedure 18(a) ........................... 30

Eleventh Circuit Rule 32-4 .................................................... 62

Federal Rules of Appellate Procedure

Rule 4(a)(1)(A) ................................................................ xii

Rule 4(a)(4)(A) ................................................................ xii

Rule 32(a)(5)(A) ............................................................... 62

Rule 32(a)(6) .................................................................... 62

Rule 32(a)(7) .................................................................... 62

Federal Rules of Civil Procedure

Rule 30(b)(6) .................................................................... 57

Rule 56 ............................................................................. 20

## SECONDARY SOURCES

11A STEVEN PLITT ET AL.,
COUCH ON INSURANCE § 167:33 (3d ed. 2021) ................................27

\*marks the authority on which this brief chiefly relies.

# STATEMENT OF JURISDICTION

As this Court determined in its January 7, 2022, order in this appeal, the District Court had diversity subject-matter jurisdiction under 28 U.S.C. § 1332(a). Ms. Walker is a citizen of Alabama. (Doc. 125-29 at 5.) LINA is incorporated under Pennsylvania law and has its principal place of business in Pennsylvania. (*See, e.g.*, Doc. 21, ¶ 4; Doc. 37, ¶¶ 4, 7.) The amount in controversy exceeds $75,000. (*See* Doc. 189 at 1.)

This Court has appellate jurisdiction under 28 U.S.C. § 1291. This appeal is timely under Rule 4(a)(1)(A) and Rule 4(a)(4)(A) of the Federal Rules of Appellate Procedure. The District Court entered final judgment on June 24, 2021. (Doc. 198.) The next day, Ms. Walker moved to amend the judgment. (Doc. 199.) The District Court disposed of that motion on July 15, 2021 (Doc. 203) and entered an amended final judgment on the same day. (Doc. 204.) Ms. Walker then filed her notice of appeal eight days later, on July 23, 2021. (Doc. 206.)

# STATEMENT OF THE ISSUES

1.    The Alabama Supreme Court has held that breach of a disability insurance contract does not present an exception to the general rule against mental-anguish damages for breach of contract. Did the District Court properly exclude evidence of alleged mental anguish?

2.    Under settled Alabama law, all insurance bad-faith plaintiffs must prove the lack of a legitimate, arguable reason for an insurer's claim decision. Did the District Court correctly grant summary judgment in LINA's favor on Ms. Walker's bad-faith claim where expert opinions gave rise to a legitimate, arguable reason for LINA's claims decisions?

3.    Federal law governs postjudgment interest in a diversity case. Did the District Court accurately award postjudgment interest at the federal statutory rate when the relevant insurance policy did not reflect an intention to contract around the federal rate?

4.    Alabama law presumes that prejudgment interest is calculated as simple interest. Did the District Court correctly calculate prejudgment interest as simple interest when the relevant insurance policy did not expressly provide for compound interest?

# STATEMENT OF THE CASE

## I.   Nature of the Case

This lawsuit is about Ms. Walker's claims for disability benefits under two insurance policies: long-term disability benefits under a group long-term disability insurance policy, and waiver-of-premium benefits under a group life-insurance policy. Both benefits at issue depend on Ms. Walker's inability to perform the material duties of *any* occupation. In connection with LINA's investigation of Ms. Walker's claims to these benefits, numerous medical professionals evaluated Ms. Walker's condition and determined that she was capable of sedentary employment. Multiple rehabilitation specialists also concluded that Ms. Walker could perform occupations in her local labor market, accounting for her skills and abilities. Based on these assessments, LINA denied Ms. Walker's claims for ongoing long-term disability benefits under the long-term disability policy and waiver-of-premium benefits under the life-insurance policy.

Ms. Walker sued for breach of contract and insurance bad faith. In a thorough, 71-page opinion on LINA's motion for summary judgment, the District Court held Ms. Walker's bad-faith claim failed as a matter of law. It determined that because LINA had based its denial decision on

medical and other expert opinions, Ms. Walker could not carry her burden to prove that LINA lacked a legitimate, arguable, or debatable reason for terminating disability benefits.

Ms. Walker's remaining claims for breach of the long-term disability policy and the life-insurance policy were tried to a jury. The jury found that LINA correctly denied waiver-of-premium benefits under the life-insurance policy, but the jury awarded past-due long-term disability benefits. The District Court also awarded both prejudgment and postjudgment interest. Ms. Walker now appeals.

## II.   Statement of the Facts

### A.   The insurance policies.

As an employee of Athens–Limestone Hospital, Ms. Walker qualified as an eligible employee under a group long-term disability insurance policy (the "LTD Policy") (Doc. 125-3) and a group life-insurance policy (the "Life Policy") (Doc. 125-4.)

The LTD Policy required that an employee satisfy a contractual definition of "Disability/Disabled" to receive any disability benefits. (*See* Doc. 125-3 at 10, 15.) The LTD Policy's definition of "Disability/Disabled" has two parts. (*See id.* at 5.) For the first 24 months of benefits, an employee

would be "considered Disabled if, solely because of Injury or Sickness, he or she is: 1. unable to perform the material duties of his or her Regular Occupation; and 2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation." (*Id.*) After benefits "have been payable for 24 months," however, the contractual definition of "Disabled" changes to require, among other things, that the employee be "unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience." (*Id.*) That is, the LTD Policy states:

> After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:
>
> 1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
>
> 2. unable to earn 60% or more of his or her Indexed Earnings.

(*Id.*)

The Life Policy included a provision that allowed life-insurance benefits to continue without the employee making premium payments. This "Extended Death Benefit with Waiver of Premium" provision has two parts. (Doc. 125-4 at 14–15.) First, under the "Extended Death Benefit" subheading, the Life Policy states:

4

If an Employee becomes Disabled and is less than age 60, the Life Insurance Benefits shown in the Schedule of Benefits will be extended without premium payment until the earlier of the following dates:

1. The date the Employee is no longer Disabled.
2. The date the Employee fails to qualify for Waiver of Premium or fails to provide proof of Disability as indicated under *Waiver of Premium*.

(*Id.* at 14.) For purposes of this "Extended Death Benefit," the terms "Disability" and "Disabled" mean that "because of Injury or Sickness the Employee is unable to perform all the material duties of his or her Regular Occupation; or is receiving disability benefits under the Employer's plan." (*Id.*)

Second, under the "Waiver of Premium" subheading, the Life Policy states:

If the Employee submits satisfactory proof that he or she has been continuously Disabled for the Waiver Waiting Period shown in the Schedule of Benefits, coverage will be extended up to the Maximum Benefit Period shown in the Schedule of Benefits.

(*Id.* at 15.)

The Extended Death Benefit with Waiver of Premium provision in the Life Policy also contains a subsection titled "Termination of Waiver." (*Id.*) This provision provides that "Insurance will end for any Employee whose premiums are waived on the earliest of the following dates. 1. The

5

date he or she is no longer Disabled. . . ." (*Id.*) The terms "Disability" and "Disabled" mean that "because of Injury or Sickness an Employee is unable to perform all the material duties of any occupation which he or she may reasonably become qualified based on education, training or experience." (*Id.*)

### B. Ms. Walker's claims and appeals.

#### *1. The long-term disability claim.*

Maintaining she was disabled because of certain medical conditions (including fibromyalgia, arthritis, degenerative disc disease, adrenal insufficiency, hypertension, and hypothyroidism), Ms. Walker submitted a claim to LINA for long-term disability benefits under the LTD Policy. (*See* Doc. 137 at 19.)

LINA approved Ms. Walker's claim and awarded disability benefits in February 2013 for a period of 24 months, beginning in November 2012. (Doc. 125-28 at 2–3; Doc. 137 at 26.) It determined that she was unable to perform the material duties of her Regular Occupation and was unable to earn at least 80% of her Indexed Earnings from working in her Regular Occupation. (*Se*e Doc. 137 at 26.)[1]

---

[1]     Soon after, the Social Security Administration denied Ms. Walker's

Because the definition of "Disability" under the LTD Policy changes after 24 months, LINA conducted an investigation to determine Ms. Walker's eligibility for benefits beyond the initial two-year period. (Doc. 125-34 at 2.) LINA evaluated Ms. Walker's capability to perform the material duties of *any* occupation, and to earn at least 60% of her regular earnings. (*Id.*; Doc. 137 at 28.)

In connection with its review, LINA considered two reports from experts in their field. First, LINA secured a peer review report from Dr. Matthew Lundquist. (Doc. 125-18 at 2–17.) Dr. Lundquist is an independent physician who is board-certified in Occupational Medicine. (*Id.* at 2.) Dr. Lundquist stated that Ms. Walker's condition warranted some work-activity restrictions, but he concluded that Ms. Walker could perform work at a sedentary level. (*Id.* at 14–15; Doc. 137 at 28–29.) Second, LINA also referred Ms. Walker's file to its vocational department for a transferrable skills analysis ("TSA") by rehabilitation specialist Colin Loris. (Doc. 125-35 at 2–3.) Mr. Loris is a certified rehabilitation counselor and

---

claim for Social Security Disability Benefits. The Social Security Administration decided that while Ms. Walker had some restrictions, she was still able to perform certain types of work. (Doc. 125-30 at 13; Doc. 125-31 at 2.) It later overturned this decision. (Doc. 125-33 at 2.)

holds a master's degree in rehabilitation counseling. (Doc. 125-36 at 6.) Mr. Loris determined that—based on Ms. Walker's education, training, diagnoses, limitations, skills, and abilities—Ms. Walker could perform occupations in her local labor market. (Doc. 125-35 at 2–3.) Based on these assessments, LINA determined that Ms. Walker did not satisfy the LTD Policy's definition of disability as of November 11, 2014, and LINA informed Ms. Walker that she would not be eligible to receive LTD benefits beyond that date. (Doc. 125-34 at 2–3; Doc. 137 at 30.)

Ms. Walker appealed. Along with considering Ms. Walker's complete file in connection with the appeal, LINA also engaged an independent board-certified rheumatologist, Dr. David Knapp, to review Ms. Walker's medical records and evaluate her functionality. (Doc. 125-24 at 2–25; Doc. 137 at 31.) During his review, Dr. Knapp conferred with one of Ms. Walker's physicians, Dr. Chen. (*Id.* at 21.) Dr. Chen indicated that Ms. Walker could perform at the sedentary physical demand level. (*Id.* at 24; Doc. 137 at 32.) Following his review of Ms. Walker's records and his conferral with Dr. Chen, Dr. Knapp concluded that Ms. Walker did not require medically necessary work-activity restrictions. (Doc. 125-24 at 22; Doc. 137 at 33.)

Given Dr. Knapp's opinion, LINA determined that it was appropriate to rely on a November 2014 TSA completed by rehabilitation specialist Randy Norris to assess whether occupations were available. (*See* Doc. 123-38 at 4.) The November 2014 TSA identified occupations Ms. Walker could perform in her local labor market based on her education, training, skills, and abilities. (Doc. 125-26 at 3.) Based on this November 2014 TSA and Dr. Knapp's opinion, LINA upheld its previous decision on Ms. Walker's claim. (Doc. 125-38 at 2; Doc. 137 at 34–36.)

### *2. The waiver-of-premium claim.*

In connection with its initial approval of Ms. Walker's claim for benefits under the LTD Policy, LINA also approved Ms. Walker for Extended Death Benefits under the Life Policy, which waived her life-insurance premiums. (Doc. 125-6 at 2; Doc. 137 at 36.) In July 2013, LINA began a review of Ms. Walker's claim for waiver-of-premium benefits. (*See* Doc. 125-8.) To qualify for those waiver-of-premium benefits, the Life Policy's terms required that Ms. Walker be unable to perform the material duties of any occupation. (Doc. 125-4 at 14–15.) LINA also advised Ms. Walker that it needed more information from some of her physicians to make this evaluation, but LINA explained that it would make a decision based on

the information in the file if no other records were provided. (Doc. 125-9 at 2.)

In August 2013, LINA advised Ms. Walker that her waiver-of-premium claim had been denied. (Doc. 125-10 at 2.) LINA based this decision on the results of a January 2013 Functional Capacity Exam ("FCE"), which showed that Ms. Walker was able to work at the sedentary physical demand level. (*Id.* at 2–3; Doc. 125-11 at 2–11.) LINA referred these FCE results to a rehabilitation specialist, Dr. Larry Featherston, for a TSA. (Doc. 125-12 at 2–3.) This TSA identified occupations that Ms. Walker could perform. (*Id.* at 3.) LINA then determined that Ms. Walker could not establish her inability to perform the materials duties of any occupation, as required to receive waiver-of-premium benefits. (Doc. 125-10 at 2–3.)

Ms. Walker appealed this decision. LINA referred the file to Dr. Stephen Jacobson, a board-certified physician in Occupational and Internal Medicine, for review. (Doc. 125-14 at 2–6; Doc. 137 at 39.) Dr. Jacobson agreed with the January 2013 FCE's conclusion that Ms. Walker could perform work at the sedentary level. (Doc. 125-14 at 4.) Based on Dr. Jacobson's review, LINA denied Ms. Walker's appeal because she did

not meet the applicable definition of "Disability." (Doc. 125-16 at 2–3.)

Ms. Walker filed a second appeal. LINA based its decision on this appeal on the previously discussed opinions from Dr. Lundquist. (*See* Doc. 125-19 at 2–3.) LINA also referred the restrictions and limitations identified by Dr. Lundquist to Randy Norris for a TSA. (Doc. 125-20 at 2–3.) In that June 2014 TSA, Mr. Norris identified occupations that Ms. Walker could perform. (*Id.* at 3.) LINA then denied Ms. Walker's second appeal in reliance on Dr. Lundquist's report and Mr. Norris's TSA. (Doc. 125-19 at 2–3; Doc. 137 at 41.)

Ms. Walker filed a third appeal. LINA based its decision on this appeal on the previously discussed opinions from Dr. Knapp. (Doc. 125-23 at 2–3.) In light of Dr. Knapp's report and the conclusions from a November 2014 TSA, LINA affirmed its initial decision. (Doc. 125-23 at 2; Doc. 125-26 at 2–4; Doc. 137 at 42.)

## III. Procedural History

### A. The lawsuit and relevant pretrial history.

In May 2015, Ms. Walker sued LINA under the Employee Retirement Income and Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (Doc. 1.) She amended her complaint in February 2016 (Doc. 21) and December

11

2018. (Doc. 86.) The operative Second Amended Complaint included no ERISA claims; it instead asserted state-law claims for breach of contract (*id.* ¶¶ 121–24) and bad faith (*id.* ¶¶ 125–31).

After discovery, LINA moved for summary judgment on all claims asserted against it. (Doc. 125.) The District Court granted summary judgment in LINA's favor on Ms. Walker's bad-faith claim. (Doc. 137 at 71.) It also dismissed Ms. Walker's claims for attorney's fees and punitive damages. (*Id.*) Ms. Walker sought reconsideration of this order, but the District Court denied it. (Doc. 145 at 13.) The District Court denied LINA's motion for summary judgment on the remaining claims for breach of the LTD Policy and the Life Policy. (Doc. 137 at 71.)

Before trial, the parties submitted various motions in limine, as well as pretrial briefing. LINA moved to exclude any evidence of emotional distress or mental anguish because mental-anguish damages were not recoverable on Ms. Walker's remaining claims for breach of contract. (Doc. 168 at 3.) LINA similarly argued in its trial brief that mental-anguish damages were not recoverable. (Doc. 171 at 7.) The District Court considered this issue at the final pretrial conference and determined that Ms. Walker could not recover mental-anguish damages on the breach of

contract cause of action. (Doc. 223 at 14, 106–12.)

### B. The trial and the post-trial interest jockeying.

The parties ultimately proceeded to a four-day jury trial. (*See* Doc. 208 at 20.) The jury found in LINA's favor on Ms. Walker's claims for breach of the Life Policy (Doc. 189 at 2), but it determined that LINA breached the LTD Policy (*id.* at 1). The jury then decided that Ms. Walker was entitled to past-due long-term disability benefits in the amount of $160,342.00. (*Id.*)

The parties then submitted position statements about the calculation of prejudgment interest. (*See generally* Doc. 191.) Ms. Walker sought compound prejudgment interest at the rate of 1.5% per month. (*Id.* at 2.) She also attached a document in support of her position (Doc. 191-2), which was not admitted into evidence or produced during discovery. Ms. Walker alleged this document was a LINA manual. LINA moved to strike this document (Doc. 193) and argued that prejudgment interest accrued at a simple interest rate of 1.5% per month (Doc. 191 at 10–12).

The District Court granted LINA's motion to strike and agreed with LINA's prejudgment interest calculation. (Doc. 197 at 16.) The Court then entered final judgment. (Doc. 198.) Both parties argued that this

final judgment should be amended. Ms. Walker sought to add approximately two weeks to the prejudgment interest period. (Doc. 199 at 1.) LINA requested modification of the postjudgment interest rate to the federal statutory rate. (Doc. 201 at 3.) The District Court then amended the final judgment to extend the prejudgment interest period and to require postjudgment interest at the federal rate. (Doc. 203 at 7; Doc. 204.) Ms. Walker now appeals.

## IV. Standards of Review

This Court reviews for abuse of discretion the grant of a motion in limine. *Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005).

This Court reviews a grant of summary judgment de novo, "viewing all facts and reasonable inferences in the light most favorable to the non-moving party." *Thayer v. Randy Marion Chevrolet Buick Cadillac, LLC*, 30 F.4th 1290, 1292 (11th Cir. 2022) (citation and internal quotation marks omitted).

This Court reviews de novo the calculation of prejudgment interest "when that calculation depends on the construction of state law." *SEB S.A. v. Sunbeam Corp.*, 476 F.3d 1317, 1319 (11th Cir. 2007). In addition, "where a district court interprets an insurance policy as a matter of law,"

this Court reviews de novo the interpretation of the policy. *Mich. Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 924 (11th Cir. 1998). Finally, this Court reviews for abuse of discretion a decision on a motion to strike evidence. *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1208 (11th Cir. 1997).

## SUMMARY OF THE ARGUMENT

Ms. Walker's attempts to evade settled law governing mental-anguish damages, insurance bad faith, and prejudgment and postjudgment interest are unavailing. The District Court did not err by adhering to existing Alabama precedent foreclosing mental-anguish damages in an action for breach of a disability insurance contract. Nor did it err by requiring that Ms. Walker establish the lack of a legitimate, arguable reason for LINA's claim decisions to support her bad-faith claim. And it did not err by calculating postjudgment interest at the federal rate and awarding simple prejudgment interest based on the language of the LTD Policy. This Court should affirm.

**I.** As a general rule, Alabama law does not allow a plaintiff to recover for mental anguish in an action for breach of contract. While this Court has acknowledged that limited exceptions to this rule exist, none apply here. Instead, the Alabama Supreme Court already held in *Sanford v. Western Life Insurance Co.* that a claim for breach of a disability insurance contract does not qualify for the exception. 368 So. 2d 260 (Ala. 1979). The clear holding in *Sanford* binds this Court and defeats Ms. Walker's argument about mental-anguish damages.

**II.** Under Alabama law, Ms. Walker's insurance bad-faith claim required Ms. Walker to prove the absence of a legitimate, arguable reason for LINA's claim decision. The Alabama Supreme Court unequivocally announced this rule in *State Farm Fire & Casualty Co. v. Brechbill*, 144 So. 3d 248 (Ala. 2013). LINA indisputably had a legitimate, arguable reason to support its decision on Ms. Walker's claims under the LTD Policy and the Life Policy, because LINA based its decisions on the expert opinions it received. The District Court correctly followed *Brechbill*'s requirements and granted summary judgment in LINA's favor on Ms. Walker's bad-faith claim. In addition, Ms. Walker's accusations about LINA's investigation of her claims are unavailing.

**III.** The District Court's prejudgment and postjudgment interest calculations were also correct.

**A.** The District Court rightly recognized that federal law governs postjudgment interest on a federal judgment. The LTD Policy does not clearly and unambiguously displace the operation of the federal rate, so as the District Court held, the federal rate controls.

**B.** The LTD Policy supplies the prejudgment interest rate and unambiguously provides for simple interest. That is particularly true

given Alabama's presumption against compound interest. The District Court therefore properly calculated prejudgment interest as simple, not compound, interest.

# ARGUMENT

## I. The District Court did not err in preventing Ms. Walker from seeking mental-anguish damages, because Alabama law does not permit those damages for breach of a disability insurance policy.

Alabama law generally does not allow any breach-of-contract plaintiff to recover mental-anguish damages. Only an extremely narrow range of contracts, involving contracts that create especially sensitive duties, fall into an exception to the ordinary rule. As the Alabama Supreme Court held over 40 years ago in *Sanford v. Western Life Insurance Co.*, 368 So. 2d 260 (Ala. 1979), a contract for disability insurance is not one of those rare contracts that warrants an exception to the rule. Ms. Walker cites no case undermining this binding authority. Instead, she relies on a case about an entirely different class of insurance contracts.

Because Alabama law does not allow Ms. Walker to recover mental-anguish damages here, the District Court correctly excluded evidence of Ms. Walker's alleged mental anguish.[2]

---

[2]    Ms. Walker asserts that "LINA arguably waived any right to challenge [her] seeking mental anguish damages given it did not seek summary judgment on the issue." Opening Br. at 32 n.20 (emphasis omitted). But a motion in limine—not a motion for partial summary judgment— was the correct vehicle for resolving the mental-anguish damages issue.

## A. Mental-anguish damages for breach of contract are generally not available under Alabama law.

"An award of damages for mental anguish generally is not allowed in breach-of-contract actions in Alabama." *Bowers v. Wal-Mart Stores, Inc.*, 827 So. 2d 63, 68 (Ala. 2001). What is true of contracts generally is also true of insurance: The general rule is that Alabama law "'does not permit recovery for . . . mental anguish and suffering in an action for breach of a contract of insurance.'" *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1359 (11th Cir. 2000) (quoting *Vincent v. Blue Cross-Blue Shield of Ala., Inc.*, 373 So. 2d 1054, 1056 (Ala. 1979)).

To be sure, there is "a limited exception to this rule." *Ruiz de Molina*, 207 F.3d at 1359. That is, mental-anguish damages may be recovered for breach of contract in rare areas "'where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of

---

Federal Rule of Civil Procedure 56 "focus[es] on *claims*, not the relief sought. Thus, . . . partial summary judgment as to a particular *remedy* . . . is outside the contemplation of the Federal Rules." *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 517 F. Supp. 2d 662, 666 (S.D.N.Y. 2007).

that duty will necessarily or reasonably result in mental anguish or suffering.'" *Id.* (quoting *Liberty Homes, Inc. v. Epperson*, 581 So.2d 449, 454 (Ala. 1991)). Yet those types of cases are truly "exceptional," *Bowers*, 827 So. 2d at 70, as the Alabama Supreme Court has made "very clear," *Ruiz de Molina*, 207 F.3d at 1359. "The breach of any contract which the parties consider important will always lead to some emotional distress," but that is *not* enough. *Id.* at 1361. Instead, mental-anguish damages are recoverable only for breaches of "especially sensitive duties." *Id.* This case falls into no such exception.[3]

## B. The Alabama Supreme Court held in *Sanford v. Western Life Insurance Co.* that disability insurance does not present an exception to the rule against mental-anguish damages.

Alabama law is clear that contracts for disability insurance do not create the type of "especially sensitive duties" required to support an

---

[3] Most exceptional cases involve contracts where a breach would affect the habitability of a home. *See Ruiz de Molina*, 207 F.3d at 1359. Another type of exceptional case is for contracts by physicians to deliver a child. *See Taylor v. Baptist Med. Ctr.*, 400 So. 2d 369, 374–75 (Ala. 1981); *see also Volkswagen of Am., Inc. v. Dillard*, 579 So. 2d 1301, 1306 (Ala. 1991) (addressing breach of an automobile warranty in a case that was subject to the UCC)

award of mental-anguish damages in a breach-of-contract case; the Alabama Supreme Court held in *Sanford* that mental-anguish damages are *not* available for breach of a disability-insurance contract. 368 So. 2d at 264. That clear holding binds this Court and disposes of Ms. Walker's argument about mental-anguish damages. *See James River Ins. Co. v. Ultratec Special Effects Inc.*, 22 F.4th 1246, 1256 n.10 (11th Cir. 2022) ("We are bound by the decisions of the Alabama Supreme Court on questions of Alabama law.").

*Sanford* involved a disability-insurance policy that is not meaningfully different from Ms. Walker's LTD Policy. *See Sanford*, 368 So. 2d at 261–62. There, after the insurer denied a claim for benefits under the policy, the executor of the insured's estate sued for breach of contract and demanded damages for "'grave mental anguish . . . resulting in physical suffering.'" *Id.* at 262 (citation omitted). The Alabama Supreme Court acknowledged that mental-anguish damages are available in exceptional cases "'where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering.'" *Id.* at 264 (citation

omitted). But the *Sanford* court held "that th[e] case d[id] *not* fall within an exception to the general rule" against mental-anguish damages. *Id.* (emphasis added). Alabama law is therefore clear that mental-anguish damages are unavailable for breach of a contract for disability insurance.[4]

Ms. Walker tries to avoid *Sanford* by arguing that it "recognized a case-by-case inquiry is required to determine whether an exception exists." Opening Br. at 32 (emphasis omitted). That argument fails for two reasons. First, the exception to the general rule against mental-anguish damages turns on whether "'the contractual duty or obligation is . . . coupled with matters of mental concern or solicitude.'" *Sanford*, 368 So. 2d at 264 (citation omitted). That exception contemplates a categorical inquiry depending on the type of contract at issue. *See Bowers*, 827 So. 2d at 69 (explaining that exceptions have been made for certain "areas of

---

[4]    Other courts applying Alabama law have reached the same conclusion that mental-anguish damages are unavailable for a breach of a disability-insurance contract. *See Duquette v. Nat'l Life Ins. Co.*, No. 15-cv-316, 2017 WL 5957809, at *2 (N.D. Ala. Feb. 14, 2017) (explaining that "disability insurance is not analogous to the types of contracts that have led to mental anguish damages in Alabama"); *Oliver v. MONY Life Ins. Co.*, No. 15-cv-905, 2016 WL 7384842, at *5–6 (N.D. Ala. Dec. 21, 2016). That the *Duquette* court reached the same conclusion as *Sanford*, even as it was apparently unaware of *Sanford*, only further supports LINA.

contracts"). After all, determining the nature of a contractual duty does not require case-by-case analysis. Second, none of the case-specific facts that Ms. Walker identifies is relevant. She stresses that "the plaintiff in *Sanford* was already retired before claiming disability and passed away before the lawsuit was brought." Opening Br. at 32 (emphasis omitted). But those distinctions make no difference. In *Sanford*, the insurer "admitted liability . . . on the claim for benefits" despite the plaintiff's retirement. 368 So. 2d at 262. The breach-of-contract claim in *Sanford* also survived the plaintiff's death under the Alabama survival statute that was quoted in *Sanford*. *Id.* at 263 (quoting Ala. Code § 6-5-462). The *Sanford* plaintiff's retirement and death therefore had no bearing on the Alabama Supreme Court's analysis.

Ms. Walker also tries to undermine the *Sanford* decision by arguing that LINA may not "promote[] the benefits of peace of mind when selling disability insurance" and then "claim surprise when its actions result in an insured suffering mental anguish." Opening Br. at 31. She suggests the District Court agreed with her that "'there is some type of tie'" between disability insurance and matters of mental solicitude. *Id.* (quoting Doc. 223 at 14). But this Court is "bound by the decisions of the Alabama

Supreme Court on questions of Alabama law." *James River Ins.*, 22 F.4th at 1256 n.10. Ms. Walker's attempts to question *Sanford* on the merits therefore cannot help her case. The District Court correctly recognized as much, as is apparent from reading the very language (in its full context) that Ms. Walker relies on:

> I did a deep dive in research of mental anguish damages under Alabama law. And it's pretty clear, based upon all of the scholarly research and all of the case research that mental anguish damages for contractual breaches are limited to very particular circumstances.

> I understand your argument, if I were writing, if I were ruling on a clean slate, I would probably accept your argument because I think there is some type of tie when you are talking about disability and whether there is any mental connection there. But the law is the law, and the law of Alabama says that you cannot get mental anguish damages under these circumstances.

(Doc. 223 at 14 (capitalization altered).) The District Court was right: the law is the law. (*Id.*) *Sanford* held that mental-anguish damages are not available for breach of a disability-insurance contract, and that precedent controls this appeal.

## C. Ms. Walker relies on an inapplicable case about a dissimilar class of insurance contracts.

Ms. Walker pins her mental-anguish-damages argument on the Alabama Supreme Court's decision in *Pate v. Rollison Logging Equipment,*

*Inc.*, 628 So. 2d 337 (Ala. 1993). She quotes from *Pate* at length to argue that "[a]n insurance contract related to disability benefits falls within the exception," allowing recovery of mental-anguish damages. Opening Br. at 29. But Pate dealt with *credit disability insurance*, which is an entirely different kind insurance product that has little relation to Ms. Walker's LTD Policy. *Pate* does not undermine the clear holding in *Sanford*.

The Alabama Supreme Court was clear that its holding in *Pate* was the result of three factors. First, there was the rule of contract that "'damages are generally those that flow naturally from the breach.'" *Pate*, 628 So. 2d at 345 (citation omitted). Second, there was the then-recent decision in *Independent Fire Insurance Co. v. Lunsford*, 621 So. 2d 977 (Ala. 1993), which modified precedent barring mental-anguish damages in all insurance cases.[5] Third—and most importantly—there was "*the special nature of credit disability insurance* and the reasonable expectations of the parties to such a contract of insurance." *Pate*, 628 So. 2d at 345 (emphasis added). The *Pate* court emphasized "the special nature of credit

---

[5]      *Lunsford* involved insurance on a home. 621 So. 2d at 977. Because contracts involving a home are unique from other contracts, *Lunsford* did not establish a rule for all insurance cases. *Ruiz de Molina*, 207 F.3d at 1359–60. "Nor did [*Lunsford*] abrogate the general rule against recovery for mental anguish associated with the breach of a contract." *Id.* at 1361.

disability insurance" in recognition of the plaintiff's argument that credit disability insurance "'is quite distinct from other forms of insurance in that its sole function is to satisfy, on a periodic basis, the debt which it insures.'" *Id.* (citation omitted). That is, credit disability insurance "'differs significantly from other forms of accident and health insurance, which merely pay a lump sum to the insured following a loss.'" *Id.* (alteration adopted) (citation omitted).[6]

The differences between credit disability insurance and long-term disability insurance matter. As happened in *Pate*, 628 So. 2d at 339, policyholders buy credit disability insurance when they incur specific debts. The point of the policy is to guarantee payment of that debt. If the insurer does not pay benefits owed, then the policyholder will—*by definition*—be saddled with a debt he or she cannot pay. By contrast, long-term disability insurance provides benefits into the future, and a policyholder can adjust their behavior if benefits are not paid. *See also Duquette*, 2017 WL 5957809, at *2 (explaining that a long-term disability insurance policy is

---

[6]     *See also* 11A STEVEN PLITT ET AL., COUCH ON INSURANCE § 167:33 (3d ed. 2021) ("Credit disability insurance, also referred to as credit accident and health insurance, is insurance on a debtor to provide indemnity for payments or debt becoming due or outstanding on a specific loan or other credit transaction while the debtor is disabled." (footnote omitted)).

not usually purchased with a loan). That mental-anguish damages may "flow naturally from the breach" of a contract for which the "sole function" is to insure a *specific* debt in the event of disability cannot establish that such damages are appropriate in cases that do not share the "special nature" of that unique contract. *Pate*, 628 So. 2d at 345. So on even the most capacious reading, *Pate* stands only for the proposition that a breach of an insurance contract may support mental-anguish damages if the contract goes beyond "'merely pay[ing] a lump sum to the insured following a loss,'" which most "'forms of accident and health insurance'" do not. *Id.* (citation omitted). *Pate* therefore does not apply here.

More broadly, Ms. Walker identifies no Alabama state-court precedent authorizing mental-anguish damages for breach of a long-term disability policy. Instead, she would have this Court break new ground and expand a disfavored exception. After all, the Alabama Supreme Court held in *Sanford* that mental-anguish damages were *not* available for a breach this type of policy, 368 So. 2d at 264, and "the Alabama Supreme Court has made clear that it is not eager to 'widen the breach in the general rule'" against mental-anguish damages in breach-of-contract cases. *Ruiz de Molina*, 207 F.3d at 1360 (citation and internal quotation marks

omitted). As a federal court, however, this Court has "'limited discretion . . . with respect to untested legal theories brought under the rubric of state law.'" *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007) (citation omitted). Even if this Court thought the question "could go either way," federal courts will "usually choose the narrower interpretation that restricts liability." *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 607 (7th Cir. 2000). This Court thus should not extend mental-anguish damages here.[7]

Simply put, for ordinary long-term disability insurance policies like Ms. Walker's, the Alabama Supreme Court's clear holding in *Sanford*— not the bespoke analysis in *Pate*—controls. For that reason, the District Court correctly excluded evidence of alleged mental anguish.

## D. The Court should not certify any question to the Alabama Supreme Court.

Ms. Walker suggests certifying the question "whether the breach of a disability insurance contract is reasonably expected to result in mental

---

[7] *See also, e.g.*, *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1334–35 (11th Cir. 2021) (declining to innovate in the area of state law); *Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1520 (11th Cir. 1988) (same); *Sessums v. La. Power & Light Co.*, 652 F.2d 579, 583 (5th Cir. Unit A Aug. 1981) (same); *Rhynes v. Branick Mfg. Corp.*, 629 F.2d 409, 410 (5th Cir. Unit A 1980) (same).

anguish damages" to the Alabama Supreme Court. Opening Br. at 34. But the Alabama Supreme Court would not accept any such certified question, for two reasons.

First, Alabama law allows federal courts to certify questions only when "there are no clear controlling precedents in the decisions of the Supreme Court of [Alabama]." Ala. R. App. P. 18(a). As discussed above, the Alabama Supreme Court held in *Sanford* that a case involving a disability insurance contract like Ms. Walker's "d[id] not fall within an exception to the general rule" against mental-anguish damages for breach of contract. 368 So. 2d at 264.

Second, Alabama law allows federal courts to certify questions only when they are "determinative of said cause." Ala. R. App. P. 18(a). The availability of mental-anguish damages is not determinative, because "[n]o matter how the . . . question comes out, either party could ultimately go on to prevail." *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 838 (11th Cir. 2020). That Ms. Walker's proposed question is perhaps "determinative of a key legal issue" in the litigation is not enough to support certification under Alabama law. *Id.* (internal alteration adopted).

30

## II. The District Court did not err in granting LINA's motion for summary judgment on bad faith.

The District Court correctly granted summary judgment in LINA's favor on Plaintiff's bad-faith claim, and a single, well-established point of Alabama law resolves Ms. Walker's appeal on that issue. As the Alabama Supreme Court held in *State Farm Fire & Casualty Co. v. Brechbill*, "the tort of bad faith requires proof of the . . . absence of legitimate reason for denial." 144 So. 3d 248, 258 (Ala. 2013). That element of a bad-faith claim must be met "[r]egardless of whether the claim is [for] a bad-faith refusal to pay or a bad-faith refusal to investigate." *Id.* LINA's claim decisions were based on multiple expert opinions that it gathered during its claim investigation. Those expert opinions gave rise to a legitimate, arguable, or debatable reason for denying Ms. Walker's insurance claims. Because LINA had, at minimum, an arguable reason for its decisions, Ms. Walker could not establish an essential element of her bad-faith claim, and LINA was entitled to summary judgment.

### A. Under Alabama law, all bad-faith plaintiffs must establish the absence of a legitimate, arguable reason for an insurer's decision.

As shown in Parts II.B and II.C of the Argument, the District Court correctly granted summary judgment for LINA on Ms. Walker's bad-faith

claim. But before looking at the facts here, it is necessary to clarify Ms. Walker's incomplete and misleading summary of Alabama bad-faith law. *See* Opening Br. at 36–37.

Alabama law recognizes "*one* tort of bad-faith refusal to pay a claim" when "'there is either (1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal.'" *Brechbill*, 144 So. 3d at 257–58 (internal quotation marks omitted) (quoting *Chavers v. Nat'l Sec. Fire & Cas. Co.*, 405 So. 2d 1, 7 (Ala. 1981)). In other words, "bad faith is a 'singular' tort with two different methods of proof." *Cole v. Owners Ins. Co.*, 326 F. Supp. 3d 1307, 1329 (N.D. Ala. 2018). The two methods of proof are referred to respectively by "the confusing terms 'normal' and 'abnormal' bad faith," or by "the more descriptive terms 'bad-faith refusal to pay' and 'bad-faith refusal to investigate.'" *Brechbill*, 144 So. 3d at 257 n.1.

The tort of bad faith "has four elements plus a conditional fifth element." *Id.* at 257. The five elements are:

(a) an insurance contract between the parties and a breach thereof by the defendant;

(b) an intentional refusal to pay the insured's claim;

(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);

(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;

(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

*Id.* (quoting *Nat'l Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982)). The first four elements represent the "normal" case, or the bad-faith-refusal-to-pay method of proof. *Id.* at 258. The conditional addition of the fifth element represents the "abnormal" case, or the bad-faith-re-fusal-to-investigate method of proof. *Id.* (internal quotation marks omitted).

Both methods of proving bad faith include the first four elements of the tort: "Regardless of whether the claim is a bad-faith refusal to pay or a bad-faith refusal to investigate, the tort of bad faith requires proof of the third element, absence of legitimate reason for denial." *Id.* "The existence of an insurer's lawful basis for denying a claim is a *sufficient condition* for defeating a claim that relies upon the fifth element of the insurer's intentional or reckless failure to investigate." *Id.* When an in-

33

surer's "investigation establishe[s] a legitimate or arguable reason for re-

fusing to pay [a] claim," there is no triable issue on a claim for bad-faith

failure to investigate. *Weaver v. Allstate Ins. Co.*, 574 So. 2d 771, 774 (Ala.

1990).

Bad-faith plaintiffs face a heavy burden under the absence-of-a-de-

batable-reason element of the tort:

> To establish a prima facie case of bad-faith refusal to pay an
> insurance claim, a plaintiff must show that the insurer's
> decision not to pay was without any ground for dispute; in
> other words, the plaintiff must demonstrate that the insurer
> had no legal or factual defense to the claim.

*Shelter Mut. Ins. Co. v. Barton*, 822 So. 2d 1149, 1154 (Ala. 2001) (citation

and internal quotation marks omitted). The plaintiff's burden has signif-

icant implications on summary judgment. Plaintiffs must disprove an in-

surer's reasons for denial so completely that, "[i]n the 'normal' case, a

plaintiff's bad-faith claim may not be submitted to the jury unless she

shows that she is entitled to a directed verdict on the contract claim."

*Alfa Mut. Fire Ins. Co. v. Thomas*, 738 So. 2d 815, 822 (Ala. 1999). And

in "abnormal" refusal-to-investigate cases—although the directed-verdict

standard does not apply directly[8]—a ruling that the plaintiff is "not . . .

---

[8]     *See also* Doc. 145 at 12 n.5 (discussing directed verdict standard in

entitled to a preverdict judgment on his breach of contract claim as a matter of law" effectively "eliminate[s] the third element of bad-faith," unless the "evidence for the insurer's denial was gathered *after* the denial was made." *Brechbill*, 144 So. 3d at 258–59 (internal quotation marks omitted); *see also id.* at 260 ("A bad-faith-refusal-to-investigate claim cannot survive where the trial court has expressly found as a matter of law that the insurer had a reasonably legitimate or arguable reason for refusing to pay the claim at the time the claim was denied.").

**B.    The District Court correctly granted LINA summary judgment on bad faith based on Ms. Walker's failure to establish the absence of a legitimate, arguable reason for denying her claim.**

The District Court granted LINA summary judgment because "LINA produced evidence of legitimate, arguable, or debatable reasons for terminating [Ms.] Walker's benefits." (Doc. 137 at 61.) The District Court cited the numerous medical and other expert opinions on which LINA relied in reaching its claim decision. (*Id.* at 62.) And based on those opinions, the District Court correctly found that Ms. Walker could not

---

the abnormal case).

carry her burden to show that LINA lacked a legitimate, arguable or debatable reason for terminating benefits. (*Id.* at 63.) None of Ms. Walker's contentions undermine this well-reasoned conclusion.

Ms. Walker argues that the District Court erroneously applied the "debatable reason" element of the tort of bad faith and "failed to construe the facts and draw all inferences in Ms. Walker's favor." Opening Br. at 46. She says that "whether a 'debatable reason' or failure to investigate exists . . . is a question of fact for the jury" if "evidence is in dispute and can be construed in the insured's favor." *Id.* at 47. But Ms. Walker ignores that it was her burden to show the *absence* of an arguable reason for LINA's decision. The District Court did not improperly construe any facts against Ms. Walker when deciding that she had failed to carry this burden.

LINA terminated Ms. Walker's long-term disability benefits based on Dr. Lundquist's May 2014 opinion and Mr. Loris's analysis. (Doc. 125-34 at 2–3.) Dr. Lundquist reviewed Ms. Walker's medical records, summarized the relevant points from these records, and detailed the effects of her conditions on her ability to perform various work related functions. (Doc. 125-18 at 2–17.) After completing this comprehensive review, he

concluded that Ms. Walker required certain medical restrictions, but that she could still perform sedentary work. (*Id.* at 14–17.) Next, Mr. Loris, a certified rehabilitation counselor, identified occupations Ms. Walker could perform within her work activity limitations and based on her skills and educational attainment. (Doc. 125-35 at 2–3.) In light of the conclusions reached by Dr. Lundquist and Mr. Loris, LINA determined that Ms. Walker did not meet the definition of Disability in the LTD Policy. (Doc. 125-34 at 2–3.) Whether or not Ms. Walker disagrees with Dr. Lundquist's or Mr. Loris's opinions, these opinions still gave rise to a legitimate, arguable reason for LINA's claim decision. Nothing more is needed to defeat Ms. Walker's bad-faith claim under Alabama law. *See Brechbill*, 144 So. 3d at 258.

LINA's decisions on Ms. Walker's appeal of the long-term disability decision and on the waiver-of-premium claim were supported by similar evidence. It denied her long-term disability appeal in light of Dr. Knapp's medical opinion addressing Ms. Walker's work restrictions and Mr. Norris's conclusion that Ms. Walker could still perform occupations consistent with her medical conditions, experience, and education. (Doc. 125-38 at 2–3; Doc. 125-24 at 22–24.) LINA denied her claim for waiver-of-

premium benefits based on an FCE and a TSA, which showed that she could perform occupations in her labor market. (Doc. 125-10 at 2; Doc. 125-11 at 2–11; Doc. 125-12 at 2–3.) And LINA denied her appeals of this decision based on multiple other concurring medical and vocational opinions. (*See* Doc. 125-16; Doc. 125-19; Doc. 125-23; Doc. 125-14 at 2–6; Doc. 126-20 at 2–3.)

While Ms. Walker characterizes the District Court's citation to the evidence LINA relied on in its decision letters as drawing an inference against her, the District Court drew no improper inference. Rather, it rightly concluded that LINA possessed evidence that gave rise to a legitimate, arguable reason for denying benefits. In so doing, the District Court aligned itself both with the Alabama Supreme Court's decision in *Brechbill* and other district-court decisions. It explained: "Other judges within this district have consistently held that an insurer establishes a legitimate, arguable, or debatable reason for denying a disability claim when it bases the denial decision on medical and other expert opinions that the claimant could work." (Doc. 137 at 62–63.)[9] Given the evidence

---

[9]     *See, e.g.*, *Weisberg v. Guardian Life Ins. Co. of Am.*, No. 16-cv-568, 2017 WL 5140547, at \*7 (N.D. Ala. Oct. 24, 2017); *Duquette,* 2016 WL 4247791, at \*6; *Bailey v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 12-

LINA secured during its claim investigation, Ms. Walker could not show the *absence* of an arguable reason for LINA's decision. *See Brechbill*, 144 So. 3d at 258; *Weaver*, 574 So. 2d at 774. This defeats her bad-faith claim as a matter of law.

Ms. Walker also argues that the District Court incorrectly accepted an after-the-fact rationale for LINA's decision to deny her claim and relied on evidence created after LINA's decision. Ms. Walker is wrong. The District Court's order cited the very reasons and the same evidence that LINA identified in its claim-decision letters. The District Court identified the various medical and vocational opinions that LINA secured during its claim investigation. (Doc. 137 at 61–62.) LINA cited those same opinions in its decisions letters. (*See* Doc. 125-34 at 2–3 (citing peer review completed by Dr. Lundquist and occupations determined by Mr. Loris as basis for decision on LTD claim); Doc. 125-38 at 3 (citing opinion from peer review completed by Dr. Knapp and occupations determined by Mr. Norris as basis for decision on appeal of LTD claim decision); Doc. 125-10 at 2–3 (decision related to waiver-of-premium claim citing the various medical and vocational opinions received); Doc. 125-16 at 2–3 (same);

---

cv-4206, 2015 WL 1883725, at *8 (N.D. Ala. Apr. 24, 2015).

Doc. 125-19 at 2–3 (same); Doc. 125-23 at 2–3 (same).) Thus, LINA did not base its defense to Ms. Walker's bad-faith claim on an after-the-fact justification or evidence gathered after the fact. Rather, LINA relied on exactly the same evidence cited in the claim-decision letters. Because this evidence gave rise to a legitimate reason for LINA's claim decision, Ms. Walker's bad-faith claim fails as a matter of law.

The Alabama Supreme Court's decision in *Brechbill* also confirms the District Court properly evaluated the evidence cited in LINA's initial decision and appeal letters. In *Brechbill*, the insurer made an initial decision denying a claim, and the policyholder disputed that determination. 144 So. 3d at 252. The insurer then investigated further, and it affirmed its initial claim decision. *Id.* at 252–54. In holding the insurer was not liable for bad faith, the Alabama Supreme Court did not arbitrarily exclude all evidence of the insurer's investigation after its initial claim decision. In fact, the Alabama Supreme Court highlighted that the insurer "repeatedly reviewed and reevaluated its own investigative facts" as a reason why the insurer was *not* liable for tortious failure to investigate. *Id.* at 260. The same holds true here. LINA cannot be held liable for bad faith when its claim investigation continued to disclose evidence that

40

supported its claim denial.

Finally, Ms. Walker's claims under the LTD Policy and the Life Policy overlapped. But the jury found that LINA did not breach the Life Policy. (Doc. 189 at 2.) So if Ms. Walker seeks to appeal whether LINA had a legitimate basis for terminating benefits under the Life Policy, it did. *See also Crook v. Allstate Indem. Co.*, 314 So. 3d 1188, 1198 (Ala. 2020).

The District Court therefore correctly granted summary judgment based on the reality that Ms. Walker could not carry her burden to prove the third element of her bad-faith claim: the lack of a legitimate, arguable reason for LINA's denial of her claim. *See Brechbill*, 144 So. 3d at 257.

**C. Ms. Walker's criticisms of LINA's investigation are irrelevant given her failure to establish the absence of a debatable reason, and inaccurate in any event.**

Because the District Court granted summary judgment based on Ms. Walker's inability to prove the third element of her bad-faith claim, this Court need not consider Ms. Walker's arguments about alleged flaws in LINA's investigation. Those alleged flaws go only to the fifth element of the claim, under which a "'plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.'" *Brechbill*, 144 So. 3d at 257 (citation omitted).

In any event, Ms. Walker's arguments about LINA's investigation have no merit. LINA addresses them briefly in turn:

*First*, Ms. Walker argues that "LINA's decision was based on speculation" because it "terminated [her] LTD benefits under the any occupation definition five months in advance—deciding in June she would not be disabled in November." Opening Br. at 38–39 (emphasis omitted). But LINA's decision was not speculative. Based on the evidence, it appeared that Ms. Walker's condition was relatively stable, and there was no basis for LINA to expect it would change. Moreover, Ms. Walker fails to identify a material change in her condition that occurred after LINA's initial decision. Without any evidence that Ms. Walker's condition was deteriorating, it was reasonable for LINA to decide when it did whether Ms. Walker would continue to satisfy the Policy's definition of disability when it changed to the "any occupation" definition in November 2014.

*Second*, Ms. Walker asserts that "LINA ignored [her] medical evidence" and improperly required "claims personnel simply adopt the finding of LINA's internal medical team without any evaluation," supposedly in violation of a certain regulatory settlement agreement. Opening Br. at 39–40 (emphasis omitted). That is not correct. The assertion that LINA

ignored medical evidence is refuted by the detailed medical reviews that LINA received and used. (*See, e.g.*, Doc. 125-18 at 2–17; Doc. 125-24 at 2-24.) In fact, that assertion is refuted by Ms. Walker's own deposition, during which she could not give an example of any medical record that LINA did not consider. (*See* Doc. 125-29 at 32.) And the allegation that requiring claims personnel to "defer to the medical department concerning functional limitations and restrictions" is not inconsistent with a provision in the regulatory settlement agreement that made claim managers responsible for "'evaluation and determination of disability'" under a particular policy provision. Opening Br. at 39 (emphasis omitted) (quoting Doc. 128-4 at 19).

*Third*, Ms. Walker says that "LINA failed to 'marshal' all necessary evidence" because it: (1) supposedly "[d]id not contact any of [her] treating physicians for medical records or updated opinions"; and (2) "[d]id not wait to receive [her] Social Security file," as supposedly required under the regulatory settlement agreement. Opening Br. at 40 (emphasis omitted). But Ms. Walker's assertion about her medical records is belied by Dr. Lundquist's report, which noted that he reviewed many medical records and detailed his attempts to contact Ms. Walker's physician, Dr.

Neighbors. (Doc. 125-18 at 2–3, 14.) Ms. Walker's assertion about her Social Security file is also contradicted by the regulatory settlement agreement, which states that LINA "will not delay its consideration of a claim should [Social Security Administration] records, despite [LINA's] reasonable effort, be unavailable for review in a timely manner." (Doc. 128-4 at 9.) LINA reasonably requested Ms. Walker's Social Security records in April 2014 (Doc. 129-5 at 2), and LINA did not have to wait indefinitely when the Social Security Administration failed to timely respond.

*Fourth*, Ms. Walker argues that "LINA failed to give Social Security significant weight" as supposedly required by the regulatory settlement agreement. Opening Br. at 41 (emphasis added). But that agreement specifically outlines several circumstances in which a Social Security award is *not* entitled to significant weight (Doc. 128-4 at 9–10), and Ms. Walker does not acknowledge those circumstances.

*Fifth*, Ms. Walker argues that LINA should have obtained a physical examination rather than rely on reports from doctors not licensed in Alabama. Opening Br. at 42–43. As to the licensing point, Ms. Walker cites no authority establishing that a physician must be licensed in Alabama to participate in the review of a claimant's application for disability

44

benefits. And applying Kentucky law, the Sixth Circuit rejected this exact argument, explaining that reviewing a medical file to "determine[] whether [an insured] was capable of performing the necessary functions of his job" does not involve "'diagnosis, treatment, or correction.'" *Hackney v. Lincoln Nat'l Fire Ins. Co.*, 657 F. App'x 563, 579 (6th Cir. 2016) (emphasis omitted) (quoting Ky. Rev. Stat. § 311.550(10)). As to the argument that the LTD Policy required a physical examination instead of a record review, Ms. Walker can cite no such provision in the contract.

*Sixth*, Ms. Walker argues that "LINA relied upon unreasonable vocational reports without sufficient investigation." Opening Br. at 43 (emphasis omitted). But the reports were prepared by two certified counselors, each with a master's degree in the relevant field. (Doc. 125-19 at 16, 21; Doc. 125-36 at 6.) And while Ms. Walker disputes the time spent by the vocational experts and whether the experts personally investigated the accuracy of the materials they cited, neither of those arguments renders the reports unreasonable. Ms. Walker does not explain why more time was required, and she never explains why the vocational experts should have personally investigated a medical record's accuracy when there was nothing to suggest that these records were inaccurate in the

first place.[10]

## III.  The District Court correctly provided postjudgment interest at the federal statutory rate and prejudgment interest at 1.5% per month simple interest under the contract.

The District Court correctly concluded that the parties did not contract around the federal postjudgment-interest statute (Doc. 203 at 7) and that the LTD Policy provided for prejudgment interest to be calculated as simple interest. (Doc. 196 at 16.) To the extent that the District Court excluded evidence offered by Ms. Walker in support of a compound interest rate (Doc. 197 at 6), it did not abuse its discretion.

### A.  The District Court correctly provided for postjudgment interest at the federal statutory rate.

The District Court correctly provided for postjudgment interest to be paid pursuant to the federal postjudgment-interest statute, 28 U.S.C.

---

[10]    In her opposition to LINA's motion for summary judgment, Ms. Walker criticized only Mr. Loris's investigation. (*See* Doc. 128-1 at 28–29 (quoting Doc. 128-1 at 881).) On appeal, she argues for the first time that Mr. Norris similarly failed to "investigate the accuracy of the information the claims personnel provided him." Opening Br. at 44. Her argument about Mr. Norris's review comes too late, and this Court should disregard it. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) ("'[A]n issue not raised in the district court and raised for the first time in an appeal will not be considered by this court.'" (citation omitted)).

§ 1961. Ms. Walker's argument to the contrary is incorrect for three reasons. First, Alabama law does not govern postjudgment interest on a federal judgment in a diversity case; federal law does. Second, the LTD Policy does not unequivocally reflect an intention to contract around the statutory postjudgment interest rate, as it must under federal law. Third—even if the default rate in the LTD Policy is construed to apply to postjudgment interest—Ms. Walker did not sue for postjudgment interest under the contract. The District Court correctly applied the federal postjudgment-interest statute.

### 1. Federal law—not Alabama law—governs postjudgment interest on a federal judgment.

Ms. Walker argues that "by Alabama statute, LINA is required to pay interest at 1.5% per month until such time as the claim is paid." Opening Br. at 52. It is not entirely clear what Alabama statute Ms. Walker thinks should apply. Although she relies most heavily on Alabama Code § 27-1-17(c), *see* Opening Br. at 52, she also quotes Alabama Code § 8-8-10, *see id.* at 51 (quoting *Jones v. Regions Bank*, 25 So. 3d 427, 438–39 (Ala. 2009) (quoting in turn Ala. Code § 8-8-10)). But regardless of which statute she refers to, Ms. Walker's reliance on Alabama law may be dismissed out of hand.

The rate of postjudgment interest on a federal judgment is a question of federal law. In particular, this Court "has held that, in awarding postjudgment interest in a diversity case, a district court will apply the federal interest statute, 28 U.S.C. § 1961(a), rather than the state interest statute." *Ins. Co. of N. Am. v. Lexow*, 937 F.2d 569, 572 n.4 (11th Cir. 1991) (citing *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1542 (11th Cir. 1985)). Alabama statutes are irrelevant. The decisions Ms. Walker cites which calculated interest based on Alabama Code § 27-1-17(c) did so in determining *prejudgment* interest in *ERISA* cases. *See Anderson v. Unum Life Ins. Co. of Am.*, 414 F. Supp. 2d 1079, 1083, 1110 (M.D. Ala. 2006); *Engelhardt v. Paul Revere Life Ins. Co.*, 77 F. Supp. 2d 1226, 1235–36 (M.D. Ala. 1999); *see also Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.*, 41 F.3d 1476, 1484 (11th Cir. 1995) ("The award of an amount of prejudgment interest in an ERISA case is a matter committed to the sound discretion of the trial court. It was clearly within the district court's discretion to use [Alabama Code] § 27-1-17(b) as an analogy to fill a gap in ERISA law." (citation and internal quotation marks omitted)). Ms. Walker's citations have no bearing on *postjudgment* interest in a non-ERISA, *diversity* case. Alabama

48

law does not determine the rate of postjudgment interest on a federal judgment.

### 2. *The policy does not reflect an intent to contract around the federal postjudgment-interest statute.*

Ms. Walker next argues that the "policy language [is] sufficient to alter the [federal statutory] postjudgment interest rate." Opening Br. at 53. It is not.

The LTD Policy provides that LINA "will pay the insured one and one-half percent per month on the amount of any claim which is considered overdue until it is finally settled and adjudicated." (Doc. 125-3 at 16.) Under federal law, "language expressing an intent that a particular interest rate apply to judgments or judgment debts" must be "'clear, unambiguous and unequivocal'" to displace the operation of 28 U.S.C. § 1961 in a diversity case. *FCS Advisors, Inc. v. Fair Fin. Co.*, 605 F.3d 144, 148 (2d Cir. 2010) (citation and emphasis omitted); *accord, e.g.*, *In re Riebesell*, 586 F.3d 782, 794 (10th Cir. 2009). If anything, the LTD Policy is unequivocal that the default interest rate does *not* apply to postjudgment interest: it specifies that the rate applies only until an overdue claim "is finally . . . adjudicated." (Doc. 125-3 at 16.) There is no sense in which a claim reduced to a federal judgment debt has not been

finally adjudicated.

Ms. Walker says that "other courts have found similar policy language to be sufficient to alter the §1961 postjudgment interest rate." Opening Br. at 52–53. But she cites only an unpublished district-court order in which a party "agreed 'to pay finance charges on the past due amounts at the rate of 1½ per month (18% annual rate).'" *Beaulieu Grp. v. Inman*, No. 10-cv-1590, 2011 WL 4971701, at \*5 (D. Ariz. Oct. 19, 2011). The language in Ms. Walker's policy is entirely different. Far from helping Ms. Walker, *Beaulieu Group* illustrates the significance of the fact that Ms. Walker's policy rate only applies until a claim is "adjudicated." (Doc. 125-3 at 16.) Ms. Walker may not recover postjudgment interest based on the contract rate because the default interest rate in the LTD Policy does not constitute a "'clear, unambiguous and unequivocal'" expression of an intent to make the "rate apply to judgments or judgment debts." *FCS Advisors*, 605 F.3d at 148 (citation and emphasis omitted).

### 3. Ms. Walker is not entitled to postjudgment interest at the contractual rate because she did not sue for postjudgment interest under the contract.

Finally—even assuming the policy's default interest rate applies to judgment debt—Ms. Walker is not entitled to postjudgment interest at

the contract rate because she did not sue for postjudgment interest under the LTD Policy. The District Court did not discuss this argument because it was not raised below; but this Court may affirm on any basis that is supported by the record and not intentionally waived by an appellee. *See Belcher Pharms., LLC v. Hospira, Inc.*, 1 F.4th 1374, 1379 (11th Cir. 2021); *United States v. Campbell*, 26 F.4th 860, 872–73 (11th Cir. 2022) (en banc).

It is important to remember the source of an entitlement to postjudgment interest. "At common law judgments do not bear interest; interest rests solely upon statutory provision." *Pierce v. United States*, 255 U.S. 398, 406 (1921). Private parties may not rewrite a federal statute by contract. They may, however, create a separate contractual right to a different measure of postjudgment interest on which they may sue in federal court. *See BP Prod. N. Am., Inc. v. Youssef*, 296 F. Supp. 2d 1351, 1355 (M.D. Fla. 2004). But relying on that separate contractual right requires a party to bring an appropriate suit on the contract. *Id.* Ms. Walker's Second Amended Complaint never invokes any contractual right to postjudgment interest. (*See generally* Doc. 86.) So even if the LTD Policy did provide for postjudgment interest at something other than the

51

federal statutory rate, Ms. Walker did not sue under any such right. The District Court therefore correctly provided postjudgment interest at the rate specified in the federal postjudgment interest statute.

## B. The District Court correctly used a simple-interest calculation to determine prejudgment interest.

The District Court correctly interpreted the LTD Policy under Alabama law and awarded simple prejudgment interest. The LTD Policy unambiguously provides for simple interest, particularly when interpreted in light of Alabama's presumption against compound interest. And the District Court did not abuse its discretion by declining to consider Ms. Walker's unpersuasive extracontractual evidence in support of complex interest.

### 1. The LTD Policy—interpreted according to Alabama law—provides for simple interest.

The LTD Policy unambiguously requires simple interest on its face.

It states:

> Disability Benefits will be paid within 45 days, upon receipt of due written proof of loss, at regular intervals of not more than one month. Disability Benefits not paid within 45 days of receipt of due written proof of loss shall be considered overdue. The Insurance Company will pay the insured one and one-half percent per month on the amount of any claim which is considered overdue until it is finally settled and adjudicated.

(Doc. 125-3 at 16.) The provision clearly states that interest is to be paid "on the amount of any *claim* which is considered overdue" (*id.* (emphasis added)), not on the full balance owed to a claimant. That conclusion is reinforced by the fact that the previous sentence of the provision—which Ms. Walker does not quote in her brief—explains when "Disability Benefits . . . shall be considered overdue," suggesting that the phrase "claim which is considered overdue" refers to a claim *for Disability Benefits*, not the full balance owed to a claimant.

The LTD Policy is particularly clear when read in the context of Alabama's presumption against compound interest. Ms. Walker's entitlement to prejudgment interest is a question of Alabama law. *See SEB S.A.*, 476 F.3d at 1320. And in Alabama, "interest on interest is not favored in the law." *Burlington N. R.R. Co. v. Whitt*, 611 So. 2d 219, 223 (Ala. 1992) (internal alteration adopted). Alabama's presumption in favor of simple interest reflects the "general principle of law that in the absence of a contract or a statute *specifically providing* for compound interest, compound interest is not to be computed on a debt." *Quinlan v. Koch Oil Co.,* 25 F.3d 936, 941 (10th Cir. 1994) (citing *Burlington N.*, 611 So. 2d at 224) (em-

53

phasis added). Interest is not calculated on a compound basis under Alabama law unless "the language of the [contract] expressly states that interest upon unpaid interest [will] be charged to the debt owed." *Bockman v. WCH, L.L.C.*, 943 So. 2d 789, 796 (Ala. 2006); *see also Burgess v. Williamson*, 506 F.2d 870, 875 (5th Cir. 1975) ("In the absence of a statute or an agreement, either express or implied, the law of Alabama is clear that the payee of a note has no right to charge and collect compound interest from the payor.").

Ms. Walker's proposed interpretation of the LTD Policy's language turns Alabama's presumption against compound interest on its head. She argues that "[w]ith each passing month the overdue benefit with that month's interest, becomes the applicable overdue amount—this amount remains 'overdue' until such time as it is paid." Opening Br. at 52. If Ms. Walker's argument were correct, then virtually any interest provision would require compound interest; so much for Alabama's presumption against "interest on interest." *Burlington N.*, 611 So. 2d at 223. And in any event, her argument begs the question; it is a description of how compound interest works, not an interpretation of the policy language.

This Court's decision in *Caradigm USA LLC v. PruittHealth, Inc.*,

964 F.3d 1259 (11th Cir. 2020), confirms that the LTD Policy provides for simple interest only. The interest provision at issue in *Caradigm* was substantially similar to the provision here; it stated that "late amounts under the contract would 'be subject to interest at the lesser of 1.5% per month or the maximum allowed by applicable law.'" *Id.* at 1280. This Court began its analysis by explaining that "[u]nder Georgia law"—as is also the case under Alabama law—"parties must explicitly agree to compound interest in their contract." *Id.* It then discussed a Georgia decision which concluded that contract language "providing for interest of '1.5% per month' . . . wasn't clear enough to justify an award of compound interest." *Id.* (quoting *Noons v. Holiday Hosp. Franchising, Inc.*, 705 S.E.2d 166, 170 (Ga. Ct. App. 2010)). Finally, this Court held "that the language in the contract to the effect that interest would be awarded at '1.5% per month' [did] not establish that the parties agreed to compound interest." *Id.*

This case is indistinguishable from *Caradigm*. Alabama law creates the same presumption in favor of simple interest that Georgia law does. And the interest provision in Ms. Walker's policy uses the same language as the provision at issue in *Caradigm* did. The same result should follow

in both cases; Ms. Walker's policy "does not establish that the parties agreed to compound interest." *Id.*

The lone case Ms. Walker cites to the contrary is unconvincing. *See* Opening Br. at 53. She relies on an unpublished order from the District of New Mexico that did not even involve the interpretation of a contract. *See Johnson v. Life Ins. Co. of N. Am.*, No. 05-cv-357, 2008 WL 11451473 (D.N.M. June 30, 2008). Instead, that court decided that "monthly compounding [was] appropriate" in the course of "exercise[ing] its discretion to determine the rate of prejudgment interest" under ERISA. *Id.* at \*7. That case has nothing to say about interpreting an interest provision in an insurance policy.

### 2. The District Court properly disregarded or declined to consider Walker's unpersuasive, extracontractual evidence in support of compound interest.

Ms. Walker finally argues that several pieces of extracontractual evidence support her argument that the policy provided for compound interest. She focuses on LINA's testimony in a Rule 30(b)(6) deposition, prior cases involving LINA, and what she asserts is a LINA "claims manual." *See* Opening Br. at 54–59. None of this evidence is convincing, however, and the District Court did not abuse its discretion by excluding the

unauthenticated so-called "claims manual."

First, Ms. Walker's reliance on the testimony of LINA's Rule 30(b)(6) representative takes the testimony out of context and ignores the fact that this witness was not directed to testify as to interest. As the District Court summarized, "the deposition excerpt does not even support Walker's assertion that [the witness] committed to the terms as indicating prejudgment interest should be calculated on a compound basis." (Doc. 197 at 14.) The witness never said he held such an interpretation and stated explicitly that he could not add anything to the contract's language. (*See* Doc. 128-3 at 98–99.) And LINA's interpretation of the LTD Policy's interest provision was not a deposition topic described with "reasonable particularity," Fed. R. Civ. P. 30(b)(6), about which the witness had been designated to testify about. (*See* Doc. 196-1 at 5.)

Second, the District Court squarely addressed the cases that Ms. Walker contends support an award of compound prejudgment interest. (*See* Doc. 197 at 7–8 n.3.) As the District Court explained, "all of the cases [Ms.] Walker identifies arose under ERISA; none took place in Alabama courts, and none involved claims for breach of contract under Alabama law." *Id.* The District Court's summary of these cases was exactly right:

- *Rochow v. Life Insurance Co. of North America* concerned "the proper method of determining equitable accounting . . . . for the purpose of correctly determining the amount of unjust enrichment derived . . . from the wrongful withholding of disability benefits." 851 F. Supp. 2d 1090, 1092 (E.D. Mich. 2012), *vacated and remanded*, 780 F.3d 364 (6th Cir. 2015) (en banc). It had nothing to do with policy interpretation.

- *Lanford v. Life Insurance Co. of North America* reflects no agreement by LINA to the method of calculating interest. No. 15-cv-4029, 2017 BL 267779, at *6 (C.D. Cal. Aug. 1, 2017).

- *Loberg v. Cigna Group Insurance* involved a court's exercise of its discretion under ERISA "to afford plaintiffs 'appropriate equitable relief'" by fashioning an award of prejudgment interest, and the court calculated interested based on § 1961, not policy language. No. 09-cv-280, 2012 WL 4089889, at *3–4 (D. Neb. Sept. 17, 2012) (quoting *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1219 (8th Cir. 1981) (in turn quoting 29 U.S.C. § 1132(a)(3)) and citing 28 U.S.C. § 1961).

- And *Fairbaugh v. Life Insurance Co. of North America* involved an award of postjudgment interest fashioned as a sanction for contempt of court. 872 F. Supp. 2d 174, 182 (D. Conn. 2012). Again, this award of postjudgment interest had nothing to do with any policy language.

Finally, as for the exclusion of the purported "claims manual," Ms. Walker badly misrepresents the District Court's reasoning. According to Ms. Walker, the District Court refused to consider the manual "because it was not 'admitted into evidence during trial and LINA did not produce the excerpt during discovery.'" Opening Br. at 58 (quoting Doc. 197 at 10) (internal alteration adopted). But the District Court was clear that it did *not* decide LINA's motion to strike on the basis that Ms. Walker did not tender the evidence at trial. (Doc. 197 at 8.) Instead, the District Court noted LINA's argument that Ms. Walker "did not properly authenticate the document," and the District Court decided the motion to strike because Ms. Walker "did not describe the source of the excerpt or produce a witness who could attest to its authenticity" and "produced no evidence that the document actually governed LINA's processing of her claim." (*Id.*

at 10.) Because Ms. Walker has not made any arguments about the District Court's actual reasons for refusing to consider the "claims manual" excerpt, she has forfeited any argument that the District Court erred by striking the evidence. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–81 (11th Cir. 2014).

In summary, the District Court correctly used a simple-interest calculation to compute prejudgment interest.

# CONCLUSION

The District Court correctly followed and applied settled principles

of law. This Court should AFFIRM.

Respectfully submitted,

/s/ *John A. Little, Jr.*

Michael D. Mulvaney
John A. Little, Jr.
MAYNARD COOPER & GALE P.C.
1901 Sixth Ave. N., Suite 1700
Birmingham, Alabama 35203
(205) 254-1000
mmulvaney@maynardcooper.com
jlittle@maynardcooper.com

*Counsel for Defendant–Appellee*
*Life Insurance Company*
*of North America*

# CERTIFICATE OF COMPLIANCE

This brief complies with the applicable type-volume limitation under Federal Rule of Appellate Procedure 32(a)(7) and Eleventh Circuit Rule 32-4. According to the word-count feature in Microsoft Word 2016, the relevant parts of this brief contain 12,175 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6). I prepared this brief in Century Schoolbook font, a proportionally spaced typeface. I used 14-point type or, for headings, a larger point size.

/s/ *John A. Little, Jr.*
OF COUNSEL