[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12493

_____

CHERRI WALKER,

Plaintiff-Appellant,

*versus*

LIFE INSURANCE COMPANY OF NORTH AMERICA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 5:16-cv-00506-HNJ

_____

Before Lagoa and Brasher, Circuit Judges, and Boulee,[*] District Judge.

Lagoa, Circuit Judge:

This case arises from an insurance dispute between Cherri Walker and Life Insurance Company of North America ("LINA"). Between 2013 and 2015, LINA made multiple determinations that Walker did not qualify for disability benefits under her long-term disability insurance policy and her life insurance policy. In response, Walker sued LINA for breach of contract and bad-faith failure to provide insurance benefits.

The district court granted summary judgment for LINA on Walker's bad-faith claim based on the multiple medical opinions that supported LINA's determinations. At a pre-trial hearing, the district court held that, under Alabama law, Walker could not recover mental anguish damages for her breach of contract claim and excluded evidence of such damages. Finally, following a jury verdict in Walker's favor on the breach of contract claim related to the long-term disability insurance policy, the district court determined that Walker was entitled to simple pre-judgment interest at a rate of 1.5 percent under the policy and simple post-judgment interest at a rate of 0.08 percent pursuant to 28 U.S.C. § 1961. In determining that the long-term disability insurance policy provided for simple rather than compound interest, the district court struck a

---

[*] Honorable J.P. Boulee, United States District Judge for the Northern District of Georgia, sitting by designation.

document produced by Walker because it was not properly authenticated.

Walker now argues that the district court erred at each of these steps. After careful review, and with the benefit of oral argument, we affirm all of the district court's rulings on appeal.

## I.    FACTUAL AND PROCEDURAL HISTORY

Walker is a citizen of Alabama. The Healthcare Authority of Athens Limestone Hospital (the "Authority") is a state entity that operates the Athens Limestone Hospital in Athens, Alabama. The Authority employed Walker as a respiratory therapist and as a director.

The Authority held for the benefit of its employees two group insurance policies: (1) a long-term disability insurance policy and (2) a life insurance policy.[1] LINA, a citizen of Pennsylvania, issued both policies.

---

[1] The life insurance policy provides certain disability benefits (e.g., waiver of premium, extension of coverage) separate from the disability policy. The jury did not find in Walker's favor on the life insurance policy, however, and the issues raised in this appeal relate solely to the disability policy. Thus, while we sometimes refer to the life policy during our discussion of the factual and procedural history of this case, we do not discuss in any detail the terms of that policy as they are not relevant to our consideration of the issues before us on this appeal.

The disability policy provides for monthly disability payments if an employee becomes "disabled."  The policy defines "disabled" as follows:

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
>
> 1. unable to perform the material duties of his or her Regular Occupation; and
>
> 2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.
>
> After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:
>
> 1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
>
> 2. unable to earn 60% or more of his or her Indexed Earnings.

Thus, the disability policy defines "disabled" differently, using one definition for initial claims and a more stringent definition after benefits have been payable for twenty-four months.

Separately, for initial coverage purposes, the policy generally requires an elimination period of ninety days.[2] And as relevant to interest paid on claims, the disability policy provides:

### Time of Payment

Disability Benefits will be paid within 45 days, upon receipt of due written proof of loss, at regular intervals of not more than one month. Disability Benefits not paid within 45 days of receipt of due written proof of loss shall be considered overdue. The Insurance Company will pay the insured one and one-half percent per month on the amount of any claim which is considered overdue until it is finally settled and adjudicated.

Any balance unpaid at the end of any period for which the Insurance Company is liable will be paid at that time.

On October 12, 2012, Walker ceased working at the Authority due to fibromyalgia, rheumatoid arthritis, and chronic pain. Walker subsequently submitted disability claims under both the disability policy and the life policy. On February 26, 2013, the Authority's Director of Human Resources, Sabrina Weaver, emailed LINA. At that point, LINA had not yet approved either of Walker's

---

[2] In the insurance industry, the term "elimination period" refers to the length of time between the occurrence of a qualifying event/condition and the receipt of benefits. Thus, under the disability policy, a disabled employee will begin receiving monthly benefits ninety days after the date of his or her disability.

disability claims. In her email, Weaver stated: "The delay in finding resolution to Ms. Walker's request for [short-term disability] and LTD has caused her severe stress which has triggered an adrenal crash. She has an appointment with a lawyer today following her doctor's appointment." LINA approved Walker's claim under the disability policy the next day.

By doing so, LINA found that Walker was incapable of performing the material duties of her regular occupation and of earning at least 80 percent of her regular earnings and therefore determined that she was entitled to twenty-four months of disability benefits. For some reason, LINA designated August 12, 2012, as Walker's date of disability, making November 11, 2012, the effective start date for the disability benefits pursuant to the disability policy's ninety-day elimination period. LINA's long-term disability claims manager, Deborah Bacak, later acknowledged that it was a mistake to select August 12, 2012, as Walker's date of disability given that Walker continued to work through October 12, 2012. In light of its decision to approve Walker's claims for disability benefits under the disability policy, LINA also automatically provisionally approved Walker's claim for waiver of premium under the life policy.

On July 9, 2013, LINA sent Walker a letter indicating that it was reviewing her claim for waiver of premium under the life policy. The letter requested that Walker provide LINA with additional medical information from her physicians, including information about her diagnosis and functional abilities. The letter also

warned Walker that failure to provide the requested information to LINA by August 22, 2013, "may result in an extension of the time period required [for LINA] to make a decision, or [LINA's] decision may be based on the available information on file." LINA followed up with Walker in a letter dated July 24, 2013, reiterating the need for additional information and reminding her of the August 22, 2013, deadline.

On August 29, 2013, based on a review of the then-available information, LINA decided not to approve Walker for continued waiver of premium under the life policy. In arriving at that decision, LINA considered, among other things, the opinion of Larry Featherston, a rehabilitation specialist who concluded that Walker could perform some occupations in her local labor market. Walker appealed LINA's August 29, 2013, decision three times over the next year and a half, and LINA affirmed that decision each time.

Meanwhile, separate from her claims for disability benefits under the two insurance policies, Walker applied for Social Security Disability Benefits. On April 8, 2014—after LINA had already twice affirmed its decision to deny Walker benefits under the life policy—the Social Security Administration (the "SSA") approved Walker for disability benefits and recognized a period of disability beginning on October 12, 2012. In making that decision, the SSA afforded "great weight" to the residual functional capacity questionnaires submitted by Dr. Nancy Neighbors, Walker's primary care physician, which showed that Walker suffered from intractable pain at multiple sites, experienced adrenal fatigue and

fibromyalgia pain one to three times a week that confined her to bed, experienced a reduced range of motion, and could not return to work. The SSA afforded only "partial weight" to the functional capacity evaluation completed by Heidi Teague on January 7, 2013, which concluded that Walker could perform sedentary work.

On June 10, 2014, around two months after the favorable SSA decision, LINA informed Walker that it had reviewed her claim under the disability policy and determined that she would no longer qualify for disability benefits beyond November 2014—the end of the initial twenty-four-month benefits period. As part of its review, LINA considered a report completed by Dr. Matthew Lundquist on May 28, 2014. Dr. Lundquist's report agreed with Teague's determination that Walker could perform sedentary work and disagreed with some of Dr. Neighbors's findings. LINA also considered a Transferable Skills Analysis performed by Colin Loris, a rehabilitation specialist. Loris's analysis concluded that Walker could perform some occupations in her local labor market, specifically the positions of office manager and health care facility administrator. Based on these opinions, LINA determined that Walker did not qualify as "disabled" for purposes of continuing to receive benefits under the disability policy beyond the initial twenty-four-month coverage period. Walker appealed that decision.

In considering Walker's appeal, LINA retained Dr. David Knapp, an independent board-certified rheumatologist, to review Walker's medical record and physical condition. Dr. Knapp's

review process included conferring by telephone with Walker's primary care physician, Dr. Neighbors, and Walker's rheumatologist, Dr. Kun Chen. Like Dr. Lundquist, Dr. Knapp prepared a comprehensive report detailing his analysis and findings. That report concluded that Walker "does not require any medically necessary work activity restrictions" and "is not physically functionally limited." In light of that report, LINA affirmed its decision to deny Walker benefits beyond the twenty-four-month initial coverage period under the disability policy.

Following these unfavorable decisions, Walker sued LINA in federal court, relying on diversity jurisdiction under 28 U.S.C. § 1332. The operative complaint asserts two claims against LINA under Alabama law: (1) breach of contract, and (2) bad-faith failure to provide insurance benefits.

LINA eventually moved for summary judgment on both of Walker's claims. As to the breach of contract claim, LINA argued that the record established that Walker did not meet the applicable definition of "disabled" under the two insurance policies. As to the bad-faith claim, LINA asserted that it had at least an "arguable reason" for denying Walker benefits under both policies based on the medical opinions indicating that Walker was physically capable of working.[3]

---

[3] As explained below, the third essential element of bad-faith claims under Alabama law is the absence of an arguable reason for failing to provide benefits. *State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 256–58 (Ala. 2013).

The district court granted in part and denied in part LINA's motion for summary judgment. The district court denied the motion as to the breach of contract claim "[b]ecause reasonable jurors could reach opposite conclusions regarding Walker's disability status after evaluating the evidence presented." But the district court agreed that LINA had an arguable reason for denying benefits based on the available record and therefore granted the motion as to the bad-faith claim. In explaining its reasoning on this point, the district court noted that "it must apply the [directed verdict] standard in evaluating the third element" of bad-faith claims. In denying Walker's subsequent motion for reconsideration, the district court clarified its discussion of the directed verdict standard and reaffirmed its position that, under the ordinary summary judgment standard, Walker's bad-faith claim was defeated by the existence of an arguable reason for denial.[4] The district court also noted that there was not a genuine issue of material fact as to whether the insurer had actually considered that reason in this case because LINA expressly referenced the relevant medical opinions in its

---

Thus, an insured cannot succeed on a bad-faith claim if the insurer had an arguable reason for denying benefits. *Id.* at 258.

[4] In its order denying reconsideration, the district court correctly noted that, up until her motion for reconsideration, Walker had not specified whether the bad-faith claim was of the "normal" or "abnormal" variety.

denial decisions.[5]    Accordingly, the case proceeded to trial on Walker's breach of contract claim alone.

Before trial, LINA filed a motion in limine and a trial brief, arguing in both that the district court should exclude evidence of mental anguish damages because such damages are unavailable under Alabama law for Walker's breach of contract claim.  In the trial brief, LINA further argued that any calculation of pre-judgment interest must be done by the court and not the jury.  In response, Walker asserted that LINA had waived the mental anguish damages argument by failing to raise it on summary judgment and that, in any event, mental anguish damages are available for her breach of contract claim under Alabama law.  Walker also acknowledged that the court, not the jury, calculates the interest owed, but she maintained that the insurance policies provide for a compound interest rate of 1.5 percent.  The district court ruled that mental anguish damages were unavailable to Walker on her breach of contract claim and that the court would calculate pre-judgment

---

[5] Walker's motion for reconsideration also argued that summary judgment was inappropriate given LINA's unexplained and unjustified alteration of Walker's date of disability.  Although the district court did not specifically address this argument in its order denying reconsideration, Walker has not developed any argument on appeal related to LINA's alteration of her date of disability, and the issue has thus been abandoned.  *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014); *see also United States v. Campbell*, 26 F.4th 860, 871–74 (11th Cir. 2022) (en banc).

interest, but it did not, at that time, resolve the issue of simple versus compound interest.

The jury ultimately reached a verdict, finding for Walker on the breach of contract claim, but only for the disability policy, and awarded Walker $160,342.00.

One week later, Walker submitted a brief containing proposed interest calculations for her successful breach of contract claim. Walker maintained that the disability policy provides for an interest rate of 1.5 percent, *compounded monthly*. In support of that position, Walker cited a series of other district court cases in which LINA ultimately either agreed or had to pay compound interest under substantially similar insurance policies. Walker also produced, for the first time, a document that purported to be an excerpt of LINA's Claims Policies and Procedures Manual. That document states that "[a]ll interest paid is compounded interest, unless the contract language specifically directs some other method of interest calculation." Lastly, Walker highlighted the following deposition testimony of LINA's corporate representative, Richard Lodi:

> Q.   And just so -- to be clear here, is the interest at one and a half percent, is it compounded monthly or compounded annually?

> [Objection to form: foundation.]

> A.   It doesn't indicate that. It just says the insurance company will pay the insured one and one-half percent per month on the amount of

> any claim which is considered overdue until it is finally settled and adjudicated.
>
> Q.    So what does that mean?
>
> A.    Other than what it says, I can't add to that.
>
> Q.    If it's one and half percent per month which would imply that it's compounded monthly that would be a reasonable interpretation even if you disagree with it?
>
> [Objection to form: foundation.]
>
> A.    That seems reasonable.

LINA moved to strike both the excerpt and the deposition testimony. As to the excerpt, LINA argued that the document had not been produced during discovery, had not been presented at trial, and had not been authenticated. As to the deposition testimony, LINA argued that Walker did not designate that deposition testimony for purposes of trial and did not question the representative on the calculation of interest at trial. LINA's motion to strike also requested that that pre-judgment interest be calculated as simple interest.

The district court granted in part and denied in part LINA's motion to strike. First, the district court ruled that that, under Alabama law, the disability policy provides for simple interest. In so ruling, the district court rejected the suggestion that LINA was bound to pay compound interest simply because it did so in other cases. Second, the district court granted LINA's request to strike the excerpt because it was not properly authenticated under

Federal Rule of Evidence 901, and, even if it had been properly authenticated, there is no indication that the excerpt applies to Alabama insurance policies.  Third, the district court denied LINA's request to strike Lodi's deposition testimony but still determined the disability policy provides for simple interest.

Ultimately, the district court determined that Walker was entitled to simple pre-judgment interest at a rate of 1.5 percent from December 2014 through June 11, 2021, totaling $94,602.11, and simple post-judgment interest at a rate of 1.5 percent from June 11, 2021, onward.  The district court contemporaneously entered a corresponding final judgment.

Walker moved to amend the final judgment to (1) calculate pre-judgment interest through June 24, 2021 (the date of the final judgment) rather than June 11, 2021, and (2) recognize May 21, 2021 (the date of the jury verdict) as the effective reinstatement date for Walker's disability benefits under the disability policy. LINA did not oppose either of Walker's requests but did request that the post-judgment interest rate be changed from 1.5 percent to 0.08 percent because post-judgment interest is governed by the federal interest statute, 28 U.S.C. § 1961, and the disability policy does not "contain an express provision" overriding the statute. Walker opposed LINA's request.

The district court entered an amended final judgment that incorporated both parties' requests.  The amended final judgment thus recognizes a simple pre-judgment interest rate of 1.5 percent, consistent with the district court's earlier ruling, and a simple post-

judgment interest rate of 0.08 percent, consistent with LINA's request.

Walker filed a timely notice of appeal.

## II.    STANDARDS OF REVIEW

We review *de novo* a district court's grant of summary judgment. *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). In doing so, we "view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014). Summary judgment is proper when the evidence, viewed in this light, "presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." *Id.* (quoting *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1307 (11th Cir. 2013)).

We also review *de novo* "a district court's determination and application of state law in a diversity case." *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1132 n.11 (11th Cir. 2010). "In Alabama, the interpretation of a contract, including an insurance contract, is a question of law reviewed *de novo*." *Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co.*, 480 F.3d 1254, 1258 (11th Cir. 2007).

We review evidentiary rulings, including rulings on motions to strike, for abuse of discretion. *United States v. Brown*, 415 F.3d 1257, 1264–65 (11th Cir. 2005); *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1208 (11th Cir. 1997). Under the abuse of discretion standard, we affirm unless the district court has either made a clear error of

judgment or applied the wrong legal standard.  *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004).  Moreover, even when a district court has abused its discretion in making an evidentiary ruling, we will not reverse the district court if the ruling constitutes harmless error.  *See Allstate Ins. Co. v. Swann*, 27 F.3d 1539, 1543 (11th Cir. 1994).

## III.    ANALYSIS

On appeal, Walker's arguments concern three main topics: (1) the dismissal of her bad-faith claim on summary judgment; (2) the availability of mental anguish damages for her breach of contract claim under Alabama law; and (3) the calculation of pre- and post-judgment interest.  We begin with the district court's summary judgment ruling as to the bad-faith claim.

### A.  The Dismissal of Walker's Bad-Faith Claim on Summary Judgment

Walker argues that the district court erred by granting summary judgment in LINA's favor on the bad-faith claim.  We disagree.  The evidence establishes that LINA had an arguable reason for determining that Walker did not qualify for disability benefits under the disability policy.

The Supreme Court of Alabama first recognized the tort of bad faith in the insurance context in *Chavers v. National Security Fire & Casualty Co.*, 405 So. 2d 1 (Ala. 1981).  In *Chavers*, the Supreme Court of Alabama held that an actionable tort arises for an insurer's conduct where there is either (1) no lawful basis for the

refusal to pay or (2) an intentional failure to determine whether or not there is any lawful basis for the refusal to pay. *Id.* at 7. Alabama courts often refer to refusal-to-pay claims as "normal" bad-faith claims and to failure-to-investigate claims as "abnormal" bad-faith claims. *See State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 256–58 (Ala. 2013). However, the Supreme Court of Alabama has emphasized that, although there are two "methods" of establishing bad faith, "there is only *one* tort of bad-faith refusal to pay." *Id.* at 257–58 (emphasis in original).

The tort of bad faith consists of the following essential elements: (1) a breach of an insurance contract; (2) a refusal to pay the claim; (3) the absence of an arguable reason for failing to pay; and (4) the insurer's knowledge of such an absence. *Id.* at 258. If a plaintiff is traveling under the failure-to-investigate theory—and thus is bringing an "abnormal" bad-faith claim—there is another essential element: (5) "the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim." *Id.* (quoting *Nat'l Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982)).

To be clear, "[r]egardless of whether the claim is a bad-faith refusal to pay or a bad-faith refusal to investigate, the tort of bad faith requires proof of the third element[:] absence of a legitimate reason for denial." *Id.* at 258; *see also McLaughlin v. Alabama Farm Bureau Mut. Cas. Ins. Co.*, 437 So. 2d 86, 91 (Ala. 1983) ("If any one of the reasons for denial of coverage is at least 'arguable,' this Court need not look any further."). In other words, a plaintiff

traveling under either theory of bad faith "must go beyond a mere showing of nonpayment and prove a *bad faith* nonpayment, a non-payment without any reasonable ground for dispute," otherwise the claim fails. *Bowen*, 417 So. 2d at 183 (emphasis in original); *see also State Farm Fire & Cas. Co. v. Balmer*, 891 F.2d 874, 877 (11th Cir. 1990) ("[R]egardless of the imperfections of [an insurer's] in-vestigation, the existence of a debatable reason for denying the claim at the time the claim was denied defeats a bad faith failure to pay claim.").

Although Alabama law historically treated the two theories of bad faith differently on summary judgment, more recent prece-dent suggests a convergence of the two theories at summary judg-ment. "Normal" bad-faith claims, i.e., claims of refusal to pay, fail as a matter of law on summary judgment if the insured is not enti-tled to a directed verdict on the related breach of contract claim. In the past, "abnormal" bad-faith claims, i.e., claims of failure to in-vestigate, however, could survive summary judgment even if the insured is not entitled to a directed verdict on the related breach of contract claim. *E.g.*, *White v. State Farm Fire & Cas. Co.*, 953 So. 2d 340, 348 (Ala. 2006). More recent precedent, however, suggests that where a "normal" bad-faith claims fails under the directed ver-dict standard so does an "abnormal" bad-faith claim. *See Brechbill*, 144 So. 3d at 258 ("Because the trial court's ruling [that the plaintiff was not entitled to a pre-verdict judgment on the contract claim] eliminated the third element of bad-faith refusal to pay, [the plain-tiff's 'abnormal' bad-faith claim] must fail."). To decide this case,

we do not have to resolve this uncertainty about the applicability of the directed verdict standard to "abnormal" bad-faith claims. Regardless of the merits of a related contract claim, all bad-faith claims fail on summary judgment "where the trial court . . . expressly [finds] as a matter of law that the insurer had a reasonably legitimate or arguable reason for refusing to pay the claim at the time the claim was denied." *Id.* at 260.[6]

In this case, Walker brought an "abnormal" bad-faith claim, which the district court disposed of via summary judgment. At first, there was some confusion regarding which theory of bad-faith Walker was traveling under and therefore whether the district court erroneously applied the directed verdict rule to the bad-faith claim. But as the district court's order denying reconsideration clarified, the district court's summary judgment ruling ultimately rested on a determination that LINA had an arguable reason for terminating Walker's disability benefits under the disability policy. We affirm that finding on appeal.

LINA's initial, June 10, 2014, determination that Walker did not qualify as "disabled" for purposes of receiving benefits beyond twenty-four months was supported by Dr. Lundquist's report and

---

[6] To the extent Walker suggests that the question of whether an arguable reason for denial exists necessarily "is a question of fact for the jury," such suggestion is incorrect. When the insurer had an arguable reason for its denial decision and there is no genuine issue of material fact on that point, summary judgment is warranted. *Weaver v. Allstate Ins. Co.*, 574 So. 2d 771, 774 (Ala. 1990).

the Transferable Skills Analysis completed by Colin Loris.[7] Likewise, LINA's January 26, 2015, decision to affirm the initial denial was supported by the same two opinions as well as the new, December 8, 2014, report by Dr. Knapp.

Walker generally contends that, when viewed along with the rest of the available information, the opinions of Dr. Lundquist, Colin Loris, and Dr. Knapp do not provide an arguable reason for denying benefits. Walker argues, for instance, that LINA did not afford sufficient weight to the SSA's favorable determination or to the opinions of Walker's treating physicians. But LINA expressly acknowledged the SSA's favorable determination in both of its decisions to deny Walker long-term disability benefits. And both of LINA's decisions were based on reports that specifically engaged with information provided by Walker's treating physicians. Thus, the record evidence indicates that that there is no genuine issue of material fact as to whether LINA considered the full range of available information.

Walker further attacks the propriety of LINA's denial decisions by highlighting a June 3, 2019, report by John W. McKinney,

---

[7] Walker argues that LINA's June 10, 2014, decision necessarily constituted bad faith because it "speculated" about what Walker's physical condition would be five months later. That argument is meritless. The November 2014 cutoff was a function of the disability policy's twenty-four-month initial coverage period, and there is no authority that suggests that LINA acted in bad faith by determining, based on Walker's physical condition at the time, that Walker would not qualify for an extension of coverage and by providing Walker with notice five months in advance of that cutoff.

a rehabilitation counselor. McKinney's report criticizes the analysis of the reports relied upon by LINA and concludes that Walker has qualified as "disabled" since October 2012. But McKinney's report was unavailable to LINA at the time of its decisions; even if the report had been available, the existence of another conflicting professional opinion would not have meant that LINA lacked an arguable reason for deciding as it did under Alabama law. *See Brechbill*, 144 So. 3d at 258–60 (concluding that the genuine dispute between the parties' experts was sufficient to defeat the insured's "abnormal" bad-faith claim on summary judgment); *McLaughlin*, 437 So. 2d at 91 (affirming the district court's grant of summary judgment in favor of the insurer on a bad-faith claim when the parties presented conflicting evidence and thus it could not be said that "there was *no* arguable reason for denial of coverage") (emphasis in original)).

Ultimately, the evidence establishes that LINA was at least *arguably* justified in determining that Walker did not qualify as "disabled" under the disability policy for purposes of receiving benefits beyond twenty-four months based on the opinions of Dr. Lundquist, Colin Loris, and Dr. Knapp. The record evidence shows that LINA considered the full range of information available to it, including information that was contrary to the reports on which it ultimately based its determinations. Even when read in the light most favorable to Walker, the record does not indicate a genuine issue of material fact over whether those reports were so obviously deficient, incomplete, or outweighed by conflicting

evidence that LINA acted in bad faith by relying on them. Because the record demonstrates that there was no genuine issue of material fact relating to this issue, Walker cannot, as a matter of law, establish the third element of bad faith, and the district court did not err by recognizing that. We affirm the summary judgment order.

### B.    Mental Anguish Damages

Walker's second main argument on appeal is that the district court erred by excluding evidence of mental anguish damages because such damages are unavailable under Alabama law. In the alternative, Walker argues that we should certify the question of the availability of mental anguish damages to the Supreme Court of Alabama. Neither of these arguments is persuasive. The Supreme Court of Alabama has made clear that mental anguish damages are unavailable for breach of contract claims related to long-term disability insurance policies, like Walker's, and no further clarification on this point of state law is needed.

In general, Alabama law does not permit the recovery of mental anguish damages for breach of contract claims, *see Birmingham Waterworks Co. v. Vinter*, 51 So. 356, 356 (Ala. 1910), including claims that concern insurance contracts, *see Vincent v. Blue Cross-Blue Shield of Ala., Inc.*, 373 So. 2d 1054, 1056 (Ala. 1979). The rationale underlying this rule is that, ordinarily, mental anguish damages are "too remote," "not within the contemplation of the parties," and not "naturally cause[d]" by a breach of contract. *F. Becker Asphaltum Roofing Co. v. Murphy*, 141 So. 630, 631 (Ala.

1932).  But Alabama law recognizes an exception to this general rule "where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of duty will necessarily or reasonably result in mental anguish or suffering." *Id.* (citing *S. Ry. Co. v. Rowe*, 73 So. 634, 638 (Ala. 1916)).  The Supreme Court of Alabama has applied this exception to breaches of contractual duties concerning the habitability of one's house or dwelling,[8] the health of pregnant women and their unborn children,[9] the safety of women during night-time travel,[10] and the safety and

---

[8] *See Indep. Fire Ins. Co. v. Lunsford*, 621 So. 977, 979 (Ala. 1993) (finding the jury's award of mental anguish damages to be proper and supported when the defendant breached a contract to insure the plaintiff's mobile home, which was damaged in a windstorm); *Liberty Homes, Inc. v. Epperson*, 581 So. 2d 449, 454 (Ala. 1991), *as modified on denial of reh'g*, (May 24, 1991) (holding that mental anguish damages were available when the defendant failed to properly construct the electrical system of plaintiff's home and where there was evidence of the plaintiff suffering mental anguish due to electrical problems); *Orkin Exterminating Co. v. Donavan*, 519 So. 2d 1330, 1333 (Ala. 1988) (holding that mental anguish damages were available for a breach of contract claim against an exterminator who failed to protect the plaintiff's house against termites).

[9] *See Taylor v. Baptist Med. Ctr., Inc.*, 400 So. 2d 369, 374–75 (Ala. 1981) (holding that mental anguish damages were available where a hospital breached a contract by failing to provide adequate medical care to a woman in labor, which resulted in the death of the child).

[10] *See Nashville, C. & St. L. Ry. v. Campbell*, 101 So. 615, 617–18 (Ala. 1924) (allowing mental anguish damages when the defendant carrier failed to stop its train at a certain station and knowingly caused a female passenger to have

operating conditions of automobiles.[11]  Based on those decisions, we have understood the mental anguish damages exception to be "narrow" and applicable only where there are "especially sensitive contractual duties."  *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1359–61 (11th Cir. 2000).

Walker argues that the disability policy falls under this exception because long-term disability insurance is "so coupled with matters of mental concern" that a breach of the contractual duty could "reasonably result in mental anguish."  In support of this argument, Walker points out that, in advertising its policies, LINA emphasizes the "peace of mind" that its policies can offer.  Walker also points to the email sent by Sabrina Weaver on February 26, 2013, which refers to Walker suffering an adrenal crash from stress over resolution of her disability claims, as evidence that Walker in fact experienced mental anguish as a result of LINA's overall conduct.[12]

---

[11] *See Volkswagen of Am., Inc. v. Dillard*, 579 So. 2d 1301, 1303, 1306–07 (Ala. 1991) (holding that mental anguish damages were available for the plaintiff's breach of warranty claim where his new automobile's conditions put him in physical danger and once left him without a working vehicle at night about three hours from home).

to wait at another station, located in a remote area without any nearby buildings or accommodations, for five to ten minutes at night).

[12] Walker contends, in a footnote, that LINA "arguably waived" the right to challenge the availability of mental anguish damages by failing to raise the issue in its motion for summary judgment.  Walker made the same contention below, but the district court implicitly rejected that argument.  We defer to

The Supreme Court of Alabama, however, has made clear that the ordinary relationship between long-term disability insurance and mental well-being is not sufficient to trigger the mental anguish damages exception.  In *Sanford v. Western Life Insurance Co.*, 368 So. 2d 260 (Ala. 1979), the plaintiff, as the executor of the decedent's estate, sued the decedent's insurer for breaching a long-term disability insurance policy that, like the disability policy here, provided for monthly payments in the event of disability.  *Id.* at 261.  On appeal, after discussing the general rule on mental anguish damages and the exception to it, the Supreme Court of Alabama concluded that the case "[did] not fall within [the] exception to the general rule."  *Id.* at 264.

Despite *Sanford*'s clear implications for this matter, Walker challenges *Sanford*'s applicability and significance on multiple fronts.  These challenges fail.

First, Walker contends that *Sanford* is factually distinguishable because, in that case, the insured employee had retired before claiming disability and died before the lawsuit commenced.  But those factual distinctions bear no relevance to the question of whether a contract itself concerns "especially sensitive duties" that are sufficiently coupled with matters of mental concern to permit recovery of mental anguish damages.

---

the district court's discretion to entertain LINA's mental anguish damages argument in a motion in limine after summary judgment and thus reject Walker's waiver argument.

Next, Walker questions the precedential value of *Sanford* by suggesting that it was decided before a major change in the law occurred. That change, according to Walker, was the Supreme Court of Alabama's decision in *Independent Fire Insurance Co. v. Lunsford*, 621 So. 2d 977 (Ala. 1993). There, the Supreme Court of Alabama affirmed a jury award for breach of an insurance contract that included damages for mental anguish. *Id.* at 979. Critically, however, the policy at issue in *Lunsford* covered a mobile home that was damaged in a windstorm. *Id.* at 978–79. Thus, rather than represent a pivotal change in the law, *Lunsford* is properly understood as one of the several instances when the Supreme Court of Alabama has applied the mental anguish damages exception to a contract concerning the habitability of a dwelling. *See, e.g.*, *Liberty Homes, Inc. v. Epperson*, 581 So. 2d 449 (Ala. 1991); *Orkin Exterminating Co. v. Donavan*, 519 So. 2d 1330, 1333 (Ala. 1988).

Lastly, Walker contends that *Pate v. Rollison Logging Equipment, Inc.*, 628 So. 2d 337 (Ala. 1993), is most applicable to the instant case and indicates that the mental anguish damages exception applies here. *Pate* concerned a credit insurance policy—a type of policy under which the insurer makes payments on the insured's existing debt if a certain event (e.g., death or disability) occurs. *Id.* at 339–40. On appeal, the Supreme Court of Alabama held that mental anguishes damages were available for the insurer's failure to make the contemplated payments after the insured became disabled. *Id.* at 345–46. The *Pate* decision is expressly predicated on "the special nature of credit disability insurance," which,

unlike long-term disability insurance, contemplates the possibility that an insured will be unable to repay a specific debt. *Id.* at 345. While *Pate* certainly reinforces the notion that the mental anguish damages exception may apply to certain insurance policies, for ordinary long-term disability insurance policies, like the policy at issue, *Sanford* controls.

In sum, the Supreme Court of Alabama held that the plaintiff in *Sanford* could not recover mental anguish damages for the insurer's breach of a long-term disability insurance policy, and neither Walker's personal circumstances nor the terms of the disability policy meaningfully distinguish this matter from *Sanford*. Alabama law therefore calls for the same outcome here.

In the alternative, Walker proposes that we certify the question of the availability of mental anguish damages to the Supreme Court of Alabama. Pursuant to Rule 18(a) of the Alabama Rules of Appellate Procedures, certification is appropriate only where the question of law is "determinative of [the] cause" and "there are no clear controlling precedents" of the Supreme Court of Alabama. The availability of mental anguish damages is not determinative of any cause, *see Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 838 (11th Cir. 2020) (explaining that a question is "determinative of [a] cause" when it resolves either the entire case or a claim and not simply a "key issue"), and *Sanford* represents a clear controlling precedent for the reasons discussed above, *see WM Mobile Bay Env't Ctr., Inc. v. City of Mobile Solid Waste Auth.*, 972 F.3d 1240, 1251 (11th Cir. 2020) (indicating that there must be

"substantial doubt" to warrant certification). Thus, certification is neither necessary nor appropriate, as Alabama law already answers the question presented.

For these reasons, we affirm the district court's exclusion of evidence of mental anguish damages in connection with Walker's breach of contract claim.

## C.    Pre- and Post-Judgment Interest

Walker's final argument is that the district court erred in its interpretation of the disability policy as to pre- and post-judgment interest. As for pre-judgment interest, Walker challenges the district court's determination that the disability policy provides for simple, rather than compound, interest and the district court's related decision to strike the excerpt of LINA's claims manual. As for post-judgment interest, Walker challenges the district court's determination that the disability policy does not contract around the default post-judgment interest rate set by 28 U.S.C. § 1961. As discussed below, we affirm the district court's rulings.

Before turning to Walker's specific pre- and post-judgment interest arguments, we review the relevant policy language, which provides:

**Time of Payment**

Disability Benefits will be paid within 45 days, upon receipt of due written proof of loss, at regular intervals of not more than one month. Disability Benefits not paid within 45 days of receipt of due written proof

of loss shall be considered overdue.  The Insurance Company will pay the insured one and one-half percent per month on the amount of any claim which is considered overdue until it is finally settled and adjudicated.

Any balance unpaid at the end of any period for which the Insurance Company is liable will be paid at that time.

### 1.  Pre-Judgment Interest

Walker contends that the Time of Payment Provision provides for *compound* pre-judgment interest at a rate of 1.5 percent. LINA, on the other hand, maintains that the district court correctly interpreted the Time of Payment Provision to provide for *simple* pre-judgment interest at a rate of 1.5 percent.  This dispute boils down to a disagreement over the meaning of the phrase "any claim which is considered overdue."    According to Walker, that phrase broadly includes the full overdue balance owed to a claimant, including any unpaid interest.  In LINA's view, the phrase refers only to overdue claims for disability benefits and not to any unpaid interest.

In federal diversity actions, pre-judgment interest is governed by state law, *see Venn v. St. Paul Fire & Marine Ins. Co.*, 99 F.3d 1058, 1066 (11th Cir. 1996), and Alabama law allows litigants to recover pre-judgment interest at a contractually specified rate for breach of contract claims, *see Burgess Min. & Constr. Corp. v. Lees*, 440 So. 2d 321, 338 (Ala. 1983).

In general, Alabama law requires courts "to enforce an un-ambiguous, lawful contract, as it is written." *Ex parte Dan Tucker Auto Sales, Inc.*, 718 So. 2d 33, 35 (Ala. 1998). "Where words used in a contract are susceptible of more than one meaning, [courts should], if possible, ascertain from all the provisions of the contract the sense in which the words were used by the parties." *Id.* at 36.

For contracts of insurance specifically, Alabama recognizes another rule: "ambiguities in the language of an insurance policy are construed in favor of the insured, rather than the insurer." *Blackburn v. Fid. & Deposit Co. of Md.*, 667 So. 2d 661, 669 (Ala. 1995). But "ambiguities are not to be inserted by strained or twisted reasoning," and "[t]he fact that the parties interpret [an] in-surance policy differently does not make the insurance policy am-biguous." *Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.*, 817 So. 2d 687, 692 (Ala. 2001). "Where the parties disagree on whether the language in an insurance contract is ambiguous, a court should construe language according to the meaning that a person of ordi-nary intelligence would reasonably give it." *Id.*

A plain and full reading of the disability policy confirms that Walker is entitled to simple pre-judgment interest. The Time of Payment Provision provides for 1.5 percent interest on "any claim which is considered overdue," and that phrase cannot properly be read to include unpaid interest (and therefore to allow for interest-on-interest). The term "claim" is used throughout the disability policy exclusively in the sense of "claim[s] for Disability." More-over, other than in the phrase at issue, the disability policy uses the

term "overdue" only one other time: in the previous sentence, referring to disability benefits. As a final point, the phrase "any claim which is considered overdue" stands in contrast to the broad language in the very next sentence of the Time of Payment Provision: "Any balance unpaid at the end of any period for which the Insurance Company is liable will be paid at that time." For these reasons, the Time of Payment Provision unambiguously provides for 1.5 percent pre-judgment interest on overdue *disability benefits* and does not provide for any interest-on-interest (i.e., compound interest).[13]

Notwithstanding the plain text of the Time of Payment Provision, Walker argues that the district court failed to properly

---

[13] LINA submits that this interpretation, besides simply being a more accurate reading of the text, better aligns with Alabama's "presumption in favor of simple interest." Certainly, the Supreme Court of Alabama has recognized, in the context of statutory interpretation, the "general American rule that when interest is allowable, it is to be computed on a simple rather than compound basis in the absence of express authorization otherwise." *Burlington N. R. Co. v. Whitt*, 611 So. 2d 219, 224 (Ala. 1992) (quoting *Stovall v. Ill. Cent. Gulf R.R.*, 772 F.2d 190, 192 (5th Cir. 1984)). It makes sense that the same presumption would apply in the context of contractual interpretation, *see Am. Mill. Co. v. Brennan Marine, Inc.*, 623 F.3d 1221, 1227 (8th Cir. 2010) (discussing the "common law presumption against compound interest" for both contractual interpretation and statutory interpretation), but the Supreme Court of Alabama has not expressly confirmed that. Assuming Alabama indeed applies the common law presumption against compound interest to contracts and does so much the same as the State of Georgia, then our decision in *Caradigm USA LLC v. PruittHealth, Inc.*, 964 F.3d 1259 (11th Cir. 2020), indicates that the disability policy's language is not sufficient to overcome that presumption.

consider the deposition testimony of LINA's corporate representative and other district court cases in which LINA paid compound interest under substantially similar policies. We disagree. The deposition testimony cited by Walker consists of LINA's corporate representative stating that it "seems reasonable" to interpret the disability policy as providing for interest compounded monthly. That testimony does not displace the plain reading of the policy or "represent a commitment by LINA to a compound interest calculation." Likewise, the district court cases cited by Walker are of limited relevance, given that they neither involve Alabama law nor could alter or modify the plain meaning of the disability policy's text. The district court expressly considered both the deposition testimony and the other district court cases, but ultimately relied on to the plain language of the disability policy. We affirm that decision.

Walker also argues that the district court erred by striking the excerpt of LINA's claims manual, which, according to Walker, confirms that the disability policy is meant to provide for compound interest. But Walker does not explain why the district court was wrong to strike the excerpt on authenticity grounds. Rule 901(a) of the Federal Rules of Evidence imposes a duty on the proponent of an item of evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is," and Walker entirely failed to do so. Thus, the district court did not abuse its discretion in striking the excerpt.

Moreover, as the district court pointed out, even assuming the excerpt were properly authenticated, it does not support Walker's view that the disability policy provides for compound interest. The excerpt does state that "[a]ll interest paid is compounded interest" unless the given contract specifies otherwise. But the excerpt purports to provide guidance for "state statutes which require interest to be paid on insurance claim[s]" and then lists the relevant states. Alabama does not appear on that list. Nor has Walker established that the excerpt was in effect during the relevant period with regard to the disability policy.[14] As a result, there is absolutely "no indication" that the excerpt applies to the disability policy. Therefore, even if the district court erred in striking the document, that decision constituted harmless error.

### 2. *Post-Judgment Interest*

Walker contends that the district court erred by concluding that the disability policy does not displace the default post-judgment interest rate set by federal statute.

Unlike pre-judgment interest, post-judgment interest is governed by federal law in diversity cases. *See Ins. Co. of N. Am. v. Lexow*, 937 F.2d 569, 572 n.4 (11th Cir. 1991). The federal post-judgment interest statute, 28 U.S.C. § 1961(a), provides:

> Interest shall be allowed on any money judgment in
> a civil case recovered in a district court. Execution
> therefor may be levied by the marshal, in any case

---

[14] The excerpt is dated "February 2, 2001 (Revised 8/9/02)."

where, by the law of the State in which such court is
held, execution may be levied for interest on judg-
ments recovered in the courts of the State.  Such in-
terest shall be calculated from the date of the entry of
the judgment, at a rate equal to the weekly average 1-
year constant maturity Treasury yield, as published
by the Board of Governors of the Federal Reserve Sys-
tem, for the calendar week preceding the date of the
judgment.  The Director of the Administrative Office
of the United States Courts shall distribute notice of
that rate and any changes in it to all Federal judges.

The parties do not dispute that, given the date of judgment,
the applicable statutory interest rate under § 1961 is 0.08 percent.
Walker asserts, however, that the disability policy contracts around
§ 1961 and sets the post-judgment interest rate at 1.5 percent.

As a preliminary matter, we recognize that this Court has
not yet weighed in on the question of whether parties may contract
around 28 U.S.C. § 1961.  The consensus among our sister circuits
that have addressed the issue, however, is that parties indeed are
free to displace the default federal post-judgment interest rate.  *See
Sovereign Bank v. REMI Cap., Inc*, 49 F.4th 360, 368 (3d Cir. 2022);
*FCS Advisors, Inc. v. Fair Fin. Co.*, 605 F.3d 144, 148 (2d Cir. 2010);
*In re Riebesell*, 586 F.3d 782, 794–95 (10th Cir. 2009); *Cent. States,
Se. & Sw. Areas Pension Fund v. Bomar Nat'l, Inc.*, 253 F.3d 1011,
1020 (7th Cir. 2001); *Citicorp Real Est., Inc. v. Smith*, 155 F.3d 1097,
1107–08 (9th Cir. 1998); *In re Lift & Equip. Serv., Inc.*, 816 F.2d

1013, 1018 (5th Cir.), *opinion modified on reh'g*, 819 F.2d 546 (5th Cir. 1987).[15]  We follow suit.

Although § 1961 speaks of post-judgment interest in mandatory terms, e.g., "[i]nterest shall be allowed on any money judgment in a civil case" and "shall be calculated [in the prescribed manner]," the statute "does not expressly limit parties' ability to agree to a different post[-]judgment interest rate" or otherwise "indicate[] that Congress sought to limit freedom of contract." *Jack Henry & Assocs., Inc. v. BSC, Inc.*, 753 F. Supp. 2d 665, 668 (E.D. Ky. 2010), *aff'd*, 487 F. App'x 246 (6th Cir. 2012).  We find the freedom of contract principles articulated in *Jack Henry* persuasive.  With some exceptions,[16] parties can agree to almost anything via contract.  "But unless some law or readily identifiable public policy removes an area from freedom of contract's realm, courts will enforce an agreement between parties." *Id.* at 668.  Here, there is nothing in the text of § 1961 that abrogates the parties' freedom of

---

[15] In its only published opinion addressing the question of whether parties can contract around § 1961, the Sixth Circuit acknowledged the consensus among other circuit courts but left the issue "for another day" because it was not necessary to resolve that issue.  *See Linneman v. Vita-Mix Corp.*, 970 F.3d 621, 636 (6th Cir. 2020).

[16] For example, parties cannot create federal subject matter jurisdiction by contract. *Tamiami Partners ex rel. Tamiami Dev. Corp. v. Miccosukee Tribe of Indians of Fla.*, 177 F.3d 1212, 1222 (11th Cir. 1999).  And courts "may refuse to enforce contracts that violate law or public policy." *See United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 42 (1987) (citations omitted).

contract. *See Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 101 (2d Cir. 2004) (explaining that the mandatory language of 28 U.S.C. § 1961 is aimed at "precluding district courts from exercising discretion over the rate of interest or adopting an interest rate set by arbitrators" rather than "limiting the ability of private parties to set their own rates"). Nor is an agreement to set post-judgment interest violative of a readily identifiable public policy. Certainly, the parties to a lawsuit "are usually in the best position to determine the amount of compensation appropriate in [the] case of delayed satisfaction," *D'Urso*, 371 F.3d at 102, and we do not read § 1961 to prevent the parties from doing so. We therefore hold that parties can contract around § 1961.

Having determined that parties can contract around § 1961, we next must determine what standard parties must satisfy in order to do so. The majority approach is to require that parties use "clear, unambiguous and unequivocal" contractual language to displace § 1961 and specify some other post-judgment interest rate. *See Sovereign Bank*, 49 F.4th at 368; *Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*, 718 F.3d 448, 458–59 (5th Cir. 2013); *In re Riebesell*, 586 F.3d at 794; *D'Urso*, 371 F.3d at 102.[17] This requirement is rooted

---

[17] Although the Ninth Circuit has not expressly adopted the "clear, unambiguous and unequivocal" language requirement, it has imposed its own "specific agreement" requirement for overriding § 1961. *See Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 387 F.3d 1021, 1023 (9th Cir. 2004); *Citicorp*, 155 F.3d at 1108–09. To satisfy that requirement, parties must specifically manifest an intent to contract around the default federal post-judgment interest rate, such as by agreeing in writing that the contractual rate will apply "after judgment."

in the notion that when a judgment is entered on a contract, any claim under the contract instantly "merges" into the judgment and loses its distinct character and identity. *See FCS Advisors*, 605 F.3d at 148; *Soc'y of Lloyd's v. Reinhart*, 402 F.3d 982, 1004 (10th Cir. 2005). Thus, absent clear, unambiguous, and unequivocal language to the contrary, the terms of a contract should govern only the original contract claim and not any successive judgment claim. Satisfied with that reasoning, and out of respect for the default rule established by § 1961, we apply the "clear, unambiguous and unequivocal" language requirement to the matter at hand.

Under the "clear, unambiguous and unequivocal" standard, the disability policy fails to displace § 1961. As relevant here, the Time of Payment Provision simply states that "[t]he Insurance Company will pay the insured one and one-half percent per month on the amount of any claim which is considered overdue until it is finally settled and adjudicated." Walker contends that, in the context of insurance claims, the phrase "finally settled and adjudicated" means "finally paid and resolved" and, based on that interpretation, concludes that the Time of Payment Provision provides for post-judgment interest in the event that judgment predates payment. But even assuming that "finally settled and adjudicated" means "finally paid and resolved," this language would not satisfy the "clear, unambiguous and unequivocal" requirement. *See D'Urso*, 371

---

*See, e.g.*, *Citicorp*, 155 F.3d at 1108. As to the Seventh Circuit, it is unclear whether that court used any heightened requirement for contracting around § 1961 in *Bomar National*.

F.3d at 102 (finding that the parties' agreement to pay 15.5 percent interest "from the date payment was due to the date payment is made" does not sufficiently establish a post-judgment interest rate of 15.5 percent); *In re Riebesell*, 586 F.3d at 794 (determining that the parties' contract providing for the accrual of interest "until payment" at the rate of 24 percent did not displace § 1961 as to post-judgment interest). Thus, we affirm the district court's ruling that § 1961 controls the post-judgment interest rate here.[18]

## IV.  CONCLUSION

For these reasons, we affirm the district court's dismissal of the bad-faith claim on summary judgment, exclusion of evidence of mental anguish damages in connection with the breach of contract claim, and calculation of pre- and post-judgment interest.

**AFFIRMED.**

---

[18] LINA insists that Walker cannot recover post-judgment interest because she "did not sue for [such] interest under the disability policy." We are satisfied that Walker may recover post-judgment interest given that the operative complaint seeks "interest . . . and such other relief as is just and appropriate" in connection with the relevant breach of contract claim.